# EXHIBIT 1

**quinn emanuel | deutschland**

An der Alster 3, 20099 Hamburg | TEL +49 40 89728-7000 | FAX +49 40 89728-7100

*Vorab per Fax: 0531-488-2665*

Landgericht Braunschweig
Münzstraße 17
38100 Braunschweig

| | | |
|---|---|---|
| Unser Zeichen | 06788-00001 / 21141329.68<br>NH/JL | **Dr. Nadine Herrmann, LL.M. (Sydney)**<br>nadineherrmann@quinnemanuel.com<br><br>**Joachim Lehnhardt**<br>joachimlehnhardt@quinnemanuel.com |

20. Juni 2016

**Klage**

In dem Rechtsstreit

1) **California State Teachers' Retirement System**, 100 Waterfront Place, West Sacramento, CA 95605, USA, gesetzlich vertreten durch das Board, dieses bestehend aus den Board Members Harry M. Keiley, Sharon Hendricks, Michael Cohen, John Chiang, Dana Dillon, Joy Higa, Paul Rosenstiel, Tom Torlakson, Thomas Unterman, Betty Yee und Nora E. Vargas, ebd.

**Az.: neu**

- Klägerin zu 1) -

[names of claimants 2 to 47 (pages 2 to 14 removed)]

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | LONDON | TOKYO | MANNHEIM | MOSCOW | PARIS | MUNICH |
SYDNEY | HONG KONG | BRUSSELS | HOUSTON | SEATTLE



<u>Prozessbevollmächtigte der Kläger und Klägerinnen:</u> Dr. Nadine Herrmann und die weiteren in Deutschland zugelassenen Rechtsanwälte der Quinn Emanuel Urquhart & Sullivan, LLP, An der Alster 3, 20099 Hamburg

g e g e n

**Volkswagen AG**, Berliner Ring 2, 38440 Wolfsburg, gesetzlich vertreten durch den Vorstand, dieser vertreten durch den Vorstandsvorsitzenden Matthias Müller, ebd.

**- Beklagte -**

**wegen:** unterlassener Ad-hoc-Mitteilung und vorsätzlicher sittenwidriger Schädigung

**Gegenstandswert:** EUR 30 Millionen (Höchstwert, § 30 Abs. 2 GKG)

vertreten Rechtsanwältin Dr. Nadine Herrmann und die weiteren in Deutschland zugelassenen Rechtsanwälte der Quinn Emanuel Urquhart & Sullivan, LLP die Kläger und Klägerinnen.

Namens und in Vollmacht der Kläger und Klägerinnen erheben wir <u>Klage</u> mit folgendem Antrag:

**I.    Die Beklagte wird verurteilt,**

    **1. an die Klägerin zu 1)** ▮▮▮▮▮▮▮ **zuzüglich Zinsen in Höhe von fünf Prozentpunkten über dem jeweiligen Basiszinssatz seit Rechtshängigkeit zu zahlen,**

▮▮▮▮ [prayers for relief for claimants 2 to 47 (pages 16 to 19 removed)] ▮▮▮▮



**II.**     **Die Beklagte hat die Kosten des Rechtsstreits zu tragen.**

**III.**    **Das Urteil ist vorläufig vollstreckbar, ggf. gegen Sicherheitsleistung.**

Für den Fall der Säumnis der Beklagten beantragen wir bereits jetzt, bei Vorliegen der gesetzlichen Voraussetzungen ein Versäumnisurteil gegen die Beklagte zu erlassen.

Zur **Begründung** tragen wir wie folgt vor, wobei wir unseren Ausführungen zur einfacheren Orientierung eine Gliederungsübersicht vorangestellt haben:

## Gliederungsübersicht

A. Einführung und Überblick ............................................................................26

B. Sachverhalt ...................................................................................................27

    I. Die Parteien des Rechtsstreits ....................................................................27

        1.     Die Kläger und Klägerinnen ..................................................27

        2.     Die Beklagte .........................................................................27

    II. Manipulation der Abgaswerte von Diesel-Pkw durch die Beklagte ...........29

        1.     Aufdeckung von Manipulationen und verspätetes Eingeständnis in den Jahren 2014 und 2015 ................................................29

                a)     Untersuchung der Abgaswerte von Diesel-Pkw der Beklagten in den USA durch das *ICCT* ...........................29

                b)     Kenntnis des Chief Executive Officers der *VWGoA* und des Vorstandsvorsitzenden der Beklagten von den begründeten Manipulationsvorwürfen ......................30

                c)     Eingeständnis der Manipulationen gegenüber *EPA* und *CARB* und Veröffentlichung der Abgasmanipulationen durch *EPA* ........32

                d)     Die Ad-hoc- und Pressemitteilungen im Zusammenhang mit dem Abgasskandal ......................................33

        2.     Der Hintergrund der Abgasmanipulationen..............................34

                a)     Die Dieseltechnologie und ihre Regulierung.................34

                      (1)     Vor- und Nachteile der Dieseltechnologie........................34

                      (2)     Emissionsgrenzwerte in Europa und den USA .................35

                b)     Die Idee der Abgasmanipulation und deren technische Umsetzung .......................................37

        3.     Bewusster Einsatz der Manipulationssoftware ab dem Jahr 2008 und hierauf basierender Erfolg der Beklagten insbesondere auf dem US-Dieselmarkt .....................................40

                a)     Abgesetzte Fahrzeuge mit manipulierten Abgaswerten ...............40

                b)     Die jeweilige Entscheidung, die Manipulationssoftware in den Diesel-Pkw der einzelnen Modelljahre zu verwenden..................41

06788-00001/21141329.68           22           Klage vom 20. Juni 2016
CalSTRS u.a. ./. Volkswagen AG
LG Braunschweig, Az. neu

      c)      Herausragende Stellung der Beklagten auf dem US-Markt für Diesel-Pkw ...................................................................................42

      d)      Kenntnis des Vorstands der Beklagten von den Manipulationen spätestens am 30. September 2008 ....................44

III. Die Bedeutung und Konsequenzen des Abgasskandals für die Beklagte und deren Aktionäre ................................................................................................49

    1.      Andauernde Untersuchung und Sanktionierung der Abgasmanipulationen in verschiedenen Ländern der EU .........................49

      a)      Staatsanwaltschaftliche Ermittlungen .............................................49

      b)      Verwaltungsbehördliche Maßnahmen in Deutschland .................50

      c)      Sanktionen in den USA .....................................................................51

    2.      Signifikanter Kursverfall der Volkswagen-Stammaktie und der Volkswagen-Vorzugsaktie ...............................................................................53

C. Rechtliche Würdigung ...........................................................................................55

   I. Zulässigkeit der Klage ........................................................................................55

   II. Begründetheit der Klage .....................................................................................56

    1.      Haftung wegen unterlassener Ad-hoc-Mitteilung (§ 37b Abs. 1 Nr. 1 WpHG) .............................................................................................................56

      a)      Insiderinformation I: Betroffenheit des US-amerikanischen Modelljahres 2009 von den Manipulationen ...............................56

           (1)      Die Beklagte unmittelbar betreffende Insiderinformation ............................................................57

           (2)      Unterlassung der unverzüglichen Veröffentlichung trotz Handlungspflicht ......................................................60

           (3)      Verschulden der Beklagten ...............................................60

      b)      Insiderinformation II-VII: Betroffenheit der US-amerikanischen Modelljahre 2010-2015 von den Manipulationen ..........................................................................................64

      c)      Insiderinformation VIII: Auf den Untersuchungen des *ICCT* basierende Vorwürfe durch *CARB* und *EPA* im Mai 2014............64

           (1)      Die Beklagte unmittelbar betreffende Insiderinformation ............................................................65

           (2)      Verschulden .........................................................................74

06788-00001/21141329.68                  23                  Klage vom 20. Juni 2016
                                                      CalSTRS u.a. ./. Volkswagen AG
                                                      LG Braunschweig, Az. neu

d)      Insiderinformation IX: Eingeständnis der Manipulationen gegenüber *CARB* und *EPA* am 3. September 2015 ......................76

     (1)      Die Beklagte unmittelbar betreffende Insiderinformation ...........................................................76

     (2)      Verschulden ...........................................................................77

c)      Aktivlegitimation der Kläger ........................................................77

2.      Haftung wegen vorsätzlicher sittenwidriger Schädigung (§ 826 BGB) ....77

a)      Vorsätzliche sittenwidrige Schädigung durch Unterlassen der Veröffentlichung der Insiderinformation I....................................78

     (1)      Sittenwidriges Verhalten..................................................78

     (2)      Vorsatz ....................................................................................80

     (3)      Zurechnung des sittenwidrigen Verhaltens und der Kenntnis ..................................................................................83

b)      Vorsätzliche sittenwidrige Schädigung durch Unterlassen der Veröffentlichung der Insiderinformationen II-VII.......................86

c)      Vorsätzliche sittenwidrige Schädigung durch Unterlassen der Veröffentlichung der Insiderinformation VIII ............................87

     (1)      Sittenwidriges Handeln...................................................87

     (2)      Vorsatz und Zurechnung...................................................87

d)      Vorsätzliche sittenwidrige Schädigung durch Unterlassen der Veröffentlichung der Insiderinformation IX................................88

3.      Haftung der Beklagten der Höhe nach.......................................................89

a)      Normativer Rahmen .......................................................................89

     (1)      Wahlrecht des Geschädigten..............................................89

     (2)      Zulässigkeit einer gespaltenen Ausübung des Wahlrechts ...........................................................................90

     (3)      Richterliche Schätzung der Schadenshöhe, § 287 ZPO.....91

b)      Ausübung des Wahlrechts durch die Kläger................................91

c)      Zur haftungsausfüllenden Kausalität ...........................................91

d)      Darlegung der Schadenshöhe.......................................................93

06788-00001/21141329.68            24            Klage vom 20. Juni 2016
CalSTRS u.a. ./. Volkswagen AG
LG Braunschweig, Az. neu

(1)     Bestimmung des Kursdifferenzschadens ........................... 93

(2)     Bestimmung des Vertragsabschlussschadens ................... 99

(3)     Schaden der jeweiligen Kläger ....................................... 100

4.     Zusammenfassung .................................................................... 105

III. Zu den geltend gemachten Zinsen ........................................................ 106

# A.
## Einführung und Überblick

Am 18. September 2015 wurde einer der größten Betrugsskandale in der Automobilindustrie    1
öffentlich. Die Volkswagen AG, die Beklagte des vorliegenden Rechtsstreits, hatte über viele Jahre
die Abgaswerte ihrer US-amerikanischen und europäischen Diesel-Pkw in Prüfsituationen
manipuliert und so Behörden und Verbrauchern vorgespiegelt, die betroffenen Dieselfahrzeuge
würden die geltenden Stickoxidgrenzwerte einhalten. In Wahrheit jedoch lag der Stickoxidausstoß
im realen Fahrbetrieb um ein Vielfaches höher (siehe hierzu unter **B.II.1.a), Rn. 12**). Diese
Manipulationen der Abgasmessungen erfolgten mithilfe einer Motorsteuerungssoftware, die
Prüfsituationen erkennt und in solchen durch entsprechende Anpassung der Motorleistung einen
geringeren Stickoxidausstoß sicherstellt. Im tatsächlichen Alltagsfahrbetrieb überschreiten die
Stickoxidemissionen die Grenzwerte jedoch bei Weitem (hierzu unter **B.II.2.b), Rn. 41**).

Die ab dem Jahr 2007 drastisch verschärften Abgasgrenzwerte in Europa und insbesondere den    2
USA stellten die Beklagte vor große technische Herausforderungen (siehe unter **B.II.2.a)(2),
Rn. 36**). Statt sich diesen Herausforderungen zu stellen, hat die Beklagte mit ihrer
Manipulationssoftware auf dem Papier normkonforme Motoren präsentiert, die in Wahrheit jedoch
nicht annähernd in der Lage waren, die Stickoxidemissionen auf ein zulässiges Maß zu begrenzen.

Mit den manipulierten Emissionstests war die Beklagte wirtschaftlich zunächst erfolgreich. Ohne    3
entsprechende Entwicklungsinvestitionen konnte sie sich eine dominierende Stellung insbesondere
auf dem US-amerikanischen Markt für Diesel-Pkw sichern, die sie als „Clean Diesel" bewarb
(hierzu im Einzelnen unter **B.II.3.c), Rn. 59**). Nach Aufdeckung des Skandals durch US-
Umweltbehörden sieht sich die Beklagte allerdings Strafzahlungen und Schadensersatzforderungen
in Milliardenhöhe ausgesetzt (**B.III.1, Rn. 88**). Diese vorhersehbaren Konsequenzen der
beschriebenen Praktiken haben auch dazu geführt, dass der Kurs der Vorzugs- und Stammaktien der
Beklagten drastisch eingebrochen ist (dazu unter **B.III.2, Rn. 101**).

Die Mitglieder des Konzernvorstandes der Beklagten und die weiteren für sie handelnden Personen    4
haben die beschriebenen Abgasmanipulationen bewusst vorgenommen und hatten deshalb schon im
Jahr 2008 von ihnen Kenntnis (hierzu unten, **B.II.3, Rn. 52**). Ihnen war auch bewusst, dass die
Beklagte spätestens am 30. September 2008 zur Offenlegung dieser Praktiken in Form einer Ad-
hoc-Mitteilung verpflichtet war.

Da es die Beklagte auch in den Folgejahren (2009 bis 2015) unterlassen hat, die Öffentlichkeit und    5
insbesondere den Kapitalmarkt über die im Zusammenhang mit dem beschriebenen Abgasskandal
stehenden Insiderinformationen unverzüglich zu informieren, hat sie auch in diesem Zeitraum
mehrfach schuldhaft gegen die Vorgaben der kapitalmarktrechtlichen Anlasspublizität verstoßen.

Mit dieser Klage machen die klagenden Anleger kapitalmarktrechtliche (siehe unten, **C.II.1,**    6
**Rn. 108**) und deliktische (hierzu unter **C.II.2, Rn. 176**) Schadensersatzansprüche gegen die
Beklagte geltend.

Im Einzelnen:

<p style="text-align:center">B.<br>**Sachverhalt**</p>

<p style="text-align:center">I.<br>**Die Parteien des Rechtsstreits**</p>

1.    **Die Kläger und Klägerinnen**

Jeder der Kläger bzw. Klägerinnen (im Folgenden: **Kläger**) hat im Zeitraum vom 1. Oktober    7
2008 bis zum 18. September 2015 Stamm- und/oder Vorzugsaktien der Beklagten erworben.
Einzelheiten zu den jeweiligen Klägern haben wir in

<p style="text-align:center">**- Anlagenkonvolut K 1 -**</p>

zusammengefasst. Hierin finden sich aus Gründen der Übersichtlichkeit auch Angaben zu
den Handelsdaten der Kläger, die Grundlage für die Schadensberechnung sind und auf die
wir weiter unten noch zurückkommen werden.

2.    **Die Beklagte**

a)    Die Beklagte hält Beteiligungen an der *AUDI AG*, der *SEAT S.A.*, der *ŠKODA*    8
*AUTO a.s.*, der *Scania AB*, der *MAN SE*, der *Dr. Ing. h.c. F. Porsche AG*, der
*Volkswagen Financial Services AG* sowie an zahlreichen weiteren Gesellschaften im
In- und Ausland. So ist insbesondere die *Volkswagen Group of America, Inc.*
(*VWGoA*) eine hundertprozentige Tochtergesellschaft der Beklagten. Daneben ist die
Beklagte Inhaberin von zwei Pkw-Marken (*Volkswagen Pkw* und *Volkswagen*
*Nutzfahrzeuge*), vgl. S. 52 des Geschäftsberichts 2014, auszugsweise überreicht als

- **Anlage K 2** -.

b)    Die personelle Struktur der Beklagten und insbesondere deren Pkw-Marke    9

*Volkswagen* stellte sich in den Jahren 2006 bis 2015 im Wesentlichen wie folgt dar:



c)    Von den in dem vorstehenden Organigramm genannten Personen ist insbesondere    10

das Handeln und Wissen der Vorstandsmitglieder der Beklagten, insbesondere des

ehemaligen Vorstandsvorsitzenden und Markenvorstands    *Prof. Dr. Dr. h. c.*

*mult. Martin Winterkorn*, dessen Vorgänger als Vorstandsvorsitzender des

Markenvorstands *Dr. Wolfgang Bernhard,* der ehemaligen Entwicklungsvorstände

der Marke *Volkswagen Dr. Ulrich Hackenberg* und dessen Nachfolger (ab 2013)

*Dr. Heinz-Jakob Neußer* (letzterer ebenso in seiner Doppelfunktion als Leiter der

Aggregatentwicklung der Beklagten sowie der Marke *Volkswagen*), des früheren Leiters der Aggregatentwicklung der Beklagten (Vorgänger von *Dr. Heinz-Jakob Neußer*), *Dr. Wolfgang Hatz*, des früheren Leiters der Aggregatentwicklung der Marke *Volkswagen Dr. Jens Hadler* (Vorgänger von *Dr. Heinz-Jakob Neußer*) sowie des früheren Leiters der Diesel-Aggregatentwicklung der Beklagten *Falko Rudolph*, wesentlich.

## II.
## Manipulation der Abgaswerte von Diesel-Pkw durch die Beklagte

Wir werden im Folgenden (**sub 1, Rn. 12**) zunächst beschreiben, wie die Abgasmanipulationen der Beklagten bekannt wurden und dabei auch darlegen, was die Beklagte öffentlich zugestanden hat. Sodann (**sub 2, Rn. 30**) gehen wir auf die Entwicklung der regulatorischen Rahmenbedingungen ein und erläutern die technischen Herausforderungen, denen die Beklagte durch immer strenger werdende Grenzwerte ausgesetzt war. Wir gehen davon aus, dass diese Teile des Sachverhalts unstreitig bleiben werden. Abschließend (**sub 3, Rn. 51**) zeigen wir, dass es unter Berücksichtigung der zuvor dargestellten Umstände schlicht ausgeschlossen ist, dass der Vorstand der Beklagten nicht spätestens im Jahr 2008 Kenntnis von den Abgasmanipulationen hatte.   11

1. **Aufdeckung von Manipulationen und verspätetes Eingeständnis in den Jahren 2014 und 2015**

   a)   **Untersuchung der Abgaswerte von Diesel-Pkw der Beklagten in den USA durch das *ICCT***

   Zu Beginn des Jahres 2014 hat das *International Council on Clean Transportation* (*ICCT*), ein Institut, das unter anderem staatliche Umweltbehörden mit wissenschaftlichen Analysen versorgt, festgestellt, dass die offiziellen Abgaswerte von in den USA vertriebenen Diesel-Pkw der Beklagten unter realen Fahrbedingungen nicht zu erreichen sind. Eine vom ICCT in Auftrag gegebene Studie überreichen wir als   12

   - Anlage K 3 -.

   Um zu zeigen, dass deutsche Diesel-Pkw in den USA aufgrund der dortigen, strengeren Abgasnormen „sauberer" sind als in Europa, untersuchte das *ICCT* ab Ende des Jahres 2013 die Abgaswerte der Modelle *Passat* (Serie 2013) und *Jetta*   13

(Serie 2012) der Beklagten, sowie das Modell *X5* des Fahrzeugherstellers *BMW*. Lediglich das Modell *X5* von *BMW* bestand den unter Alltagsfahrbedingungen durchgeführten Abgastest (vgl. dazu den Bericht der *Frankfurter Allgemeinen Zeitung* vom 23. September 2015), überreicht als

**- Anlage K 4 -**.

Bei den in Zusammenarbeit mit der *West Virginia University* durchgeführten Tests wurde festgestellt, dass die offiziell von der Beklagten (auch in den behördlichen Zulassungsverfahren) angegebenen Schadstoffwerte ihrer untersuchten US--Diesel-Pkw nicht mit den im realen Fahrbetrieb gemessenen Werten übereinstimmen. Die unter realen Fahrbedingungen ausgestoßenen Stickoxidemissionen ($NO_x$) der US-Diesel-Pkw der Beklagten lagen nach dem Ergebnis der Untersuchung bis zu **40 mal höher** als der gesetzlich zulässige Höchstwert (vgl. dazu das Schreiben der *Environmental Protection Agency* (*EPA*) vom 18. September 2015 an die Beklagte (*Notice of Violation I, dort S. 4 oben*) vorgelegt als                                                                   14

**- Anlage K 5 -**).

**b)    Kenntnis des Chief Executive Officers der *VWGoA* und des Vorstandsvorsitzenden der Beklagten von den begründeten Manipulationsvorwürfen**

(1)    Das *ICCT* veröffentlichte seine Studie (Anlage K 3) am 15. Mai 2014 und leitete seine Untersuchungsergebnisse auch an das *California Air Resources Board* (*CARB*) sowie die *EPA* weiter, die als für die Überwachung von Abgasgrenzwerten zuständigen US-Behörden dadurch erstmals Kenntnis von den Abgasmanipulationen der Beklagten erhielten (vgl. *Notice of Violation I, S. 4 Mitte, Anlage K 5*) und sodann Ermittlungen gegen die Beklagte einleiteten.                                                                   15

(2)    Nach Verifizierung der vorgenannten Testergebnisse traten *EPA* und *CARB* an die Verantwortlichen der *VWGoA* heran. Sie konfrontierten die Verantwortlichen mit den eigenen Untersuchungsergebnissen und denen des *ICCT* sowie der daraus abgeleiteten Vermutung einer Manipulation von                                                                   16

Abgaswerten durch softwaregesteuerte Abschalteinrichtungen (*defeat devices*).

(3)   Der damalige Chief Executive Officer (*CEO*) der *VWGoA*, *Michael Horn*, 17
räumte während einer Anhörung vor dem US-Kongress ein, im Frühjahr 2014
von den Ergebnissen der Untersuchungen der *ICCT* und den darauf
aufbauenden Manipulationsvorwürfen Kenntnis erlangt zu haben. Dies ergibt
sich aus der von Herrn Horn abgegebenen Erklärung vom 8. Oktober 2015,
überreicht als

**- Anlage K 6 -**.

Nach einem Bericht der *Financial Times* vom 10. März 2016, 18

**- Anlage K 7 -**,

lasse sich der (späteste) Zeitpunkt der Kenntniserlangung durch Herrn *Horn*
aufgrund einer internen E-Mail sogar noch genauer bestimmen. Danach sei
Herr *Horn* bereits am Tag der Veröffentlichung der *ICCT*-Studie (also am
15. Mai 2014) durch eine E-Mail von Herrn *Oliver Schmidt*, Mitglied des
Ressorts Umwelt und Technik der *VWGoA*, auf diese hingewiesen worden.
Im Anhang dieser E-Mail habe eine Übersicht die finanziellen Risiken der
Verstöße gegen Emissionsgrenzwerte ausgewiesen. Dort sei die Rede von
500.000 bis 600.000 Pkw der Modelljahre 2009 bis 2014 gewesen und mit
dem Hinweis „*EPA: $37.500*" sowie „*CARB: $5.500*" auch auf mögliche
Strafzahlungen hingewiesen worden.

Herr *Horn* kannte somit spätestens am 15. Mai 2014 sowohl die *ICCT*-Studie 19
als auch das Risiko von Bußgeldzahlungen in Milliardenhöhe.

**Beweis:**   Zeugnis des Herrn Michael Horn, zu laden über die Beklagte

(4)   In Anbetracht der eindeutigen Untersuchungsergebnisse des *ICCT* sowie der 20
erkennbaren unternehmerischen Bedeutung der im Raum stehenden Vorwürfe
wurden diese Informationen über die *ICCT*-Studie per Notiz vom Freitag, den
23. Mai 2014, an den damaligen Vorstandsvorsitzenden der Beklagten, *Prof.*

*Dr. Martin Winterkorn*, weitergeleitet. Dies räumte die Beklagte in einer Pressemitteilung vom 2. März 2016, die wir als

- Anlage K 8 -

überreichen, selbst ein.

Dass Herr *Winterkorn* diese Notiz nicht beachtet und daher von den  21 Vorwürfen keine Kenntnis erlangt hat, erscheint angesichts der Bedeutung der bereits zu diesem Zeitpunkt im Raum stehenden Vorwürfe nach der Lebenserfahrung praktisch ausgeschlossen. Vielmehr ist von einer Kenntnisnahme durch Herrn *Winterkorn* spätestens am Montag, den 26. Mai 2014 auszugehen. Vorsorglich bieten wir für die Kenntnis des Herrn Winterkorn an

> **Beweis:**   Zeugnis des Herrn Prof. Dr. Martin Winterkorn, zu laden über die
> FC Bayern München AG, Säbener Straße 51-57, 81547 München

c)   **Eingeständnis der Manipulationen gegenüber *EPA* und *CARB* und Veröffentlichung der Abgasmanipulationen durch *EPA***

Die Beklagte gestand nach monatelangen Verhandlungen mit dem *CARB* und der  22 *EPA* spätestens am 3. September 2015 ohne Vorbehalt ein, dass die Steuerungssoftware der in den betroffenen Pkw verbauten Motoren manipuliert war, so dass bei Abgastests geringere Stickoxidanteile ermittelt wurden, als sie im realen Fahrbetrieb anfallen. Dies ergibt sich insbesondere aus dem Schreiben des *CARB* an die Beklagte und die *VWGoA* vom 18. September 2015, vorgelegt als

- Anlage K 9 -.

Bereits am 19. August 2015 hatten Vertreter der *VWGoA* gegenüber dem *CARB*  23 Unregelmäßigkeiten im Zusammenhang mit der Software für die Motorsteuerung eingeräumt.

Am 18. September 2015 machte die *EPA* den Vorfall öffentlich bekannt (vgl. *Notice*  24 *of Violation I, Anlage K 5*).

**d)**   **Die Ad-hoc- und Pressemitteilungen im Zusammenhang mit dem Abgasskandal**

Die Beklagte selbst hat erst einige Tage nach der öffentlichen Bekanntmachung des    25
Skandals durch die *EPA* am 18. September 2015 über die Abgasmanipulationen
informiert.

(1)   Zunächst erklärte der damalige Vorstandsvorsitzende der Beklagten    26
*Winterkorn* in Form einer Pressemitteilung am 20. September 2015,

**- Anlage K 10 -**,

die US-Behörden *CARB* und *EPA* hätten im Rahmen von Abgastests an
Fahrzeugen mit Dieselmotoren der Beklagten Manipulationen und damit
Verstöße gegen amerikanische Umweltgesetze festgestellt. Der Vorstand
nehme die festgestellten Verstöße *„sehr ernst"*, der Vorstandsvorsitzende
bedauere, die Kunden und die Öffentlichkeit enttäuscht zu haben.

(2)   Am 22. September 2015 gab die Beklagte eine weitere Pressemitteilung,    27

**- Anlage K 11 -**,

heraus und erklärte unter anderem, sie treibe die Aufklärung der
*„Unregelmäßigkeiten einer verwendeten Software bei Diesel-Motoren"* mit
Hochdruck voran. Die Beklagte kündigte an, sie werde im 3. Quartal des
laufenden Geschäftsjahres *„rund 6,5 Milliarden Euro"* ergebniswirksam
zurückstellen und die Ergebnisziele des Konzerns für das Jahr 2015
entsprechend anpassen.

(3)   Ebenfalls am 22. September 2015 gab die Beklagte erstmals eine Ad-hoc-    28
Mitteilung im Zusammenhang mit dem schon seit Tagen die internationale
Presse dominierenden Manipulationsskandal heraus. In dieser als

**- Anlage K 12 -**

vorgelegten Mitteilung räumte die Beklagte unter anderem ein, dass weltweit
rund *elf Millionen* Fahrzeuge von den Manipulationen betroffen seien.

(4)   Weitere Ad-hoc-Mitteilungen der Beklagten im Zusammenhang mit dem    29
Manipulationsskandal erfolgten insbesondere am 23. September 2015,

- Anlage K 13 -,

am 3. November 2015,

- Anlage K 14 -,

sowie am 9. Dezember 2015,

- Anlage K 15 -.

2.    **Der Hintergrund der Abgasmanipulationen**

Die Mitglieder des Vorstands der Beklagten hatten – anders als die Presse- und Ad-hoc-    30
Mitteilungen im Jahr 2015 offenbar nahelegen sollen – bereits im Jahr 2008 Kenntnis von
den Abgasmanipulationen. Bei einer Gesamtbetrachtung der Umstände des Falles ist diese
Schlussfolgerung zwingend. Zunächst werden wir die technischen und regulatorischen
Herausforderungen erläutern, vor denen die Beklagte ab dem Jahr 2004 im Zusammenhang
mit der Weiterentwicklung ihrer Dieselmotoren stand (sub **a), Rn. 31**). Vor diesem
Hintergrund lässt sich sodann die Motivation für die Abgasmanipulationen der Beklagten
nachvollziehen und deren technische Umsetzung beschreiben (sub **b), Rn. 41**). Schließlich
führt eine Betrachtung der von der Beklagten (über die Jahre) abgesetzten, manipulierten
Fahrzeuge (hierzu sub **3.a), Rn. 52**) sowie deren auf die Manipulationen zurückzuführende,
nahezu konkurrenzlose Marktstellung in den USA (hierzu unter **3.c), Rn. 59**) zu dem
geradezu zwingenden Schluss positiver Kenntnis der Vorstandsmitglieder von den
Abgasmanipulationen bereits ab dem Jahre 2008 (hierzu unter **3.d), Rn. 67**).

a)    **Die Dieseltechnologie und ihre Regulierung**

    (1)    **Vor- und Nachteile der Dieseltechnologie**

Die Dieseltechnologie findet auf dem europäischen und US-amerikanischen    31
Kraftfahrzeugmarkt (zunächst ganz überwiegend im Nutzfahrzeugbereich)
seit den siebziger Jahren Verwendung. Ein erster Durchbruch dieser mit dem
Benzinmotor (Otto-Motor) konkurrierenden Antriebstechnik gelang im
Personenkraftfahrzeugbereich jedoch erst viele Jahre später.

Charakteristisch für die Funktionsweise des Dieselmotors ist die    32
Selbstzündung des in den Brennraum eingespritzten (Diesel-) Kraftstoffs.

Aufgrund der höheren Verdichtung der Kraftstoff-Luft-Mischung verfügt der Dieselmotor über einen im Vergleich zum Otto-Motor günstigeren Wirkungsgrad. Neben dem höheren Drehmoment gelten seine relative Langlebigkeit und sein geringerer Kraftstoffverbrauch als weitere große Vorteile des Dieselmotors gegenüber der Otto-Technik.

Kostenintensiv sind dagegen die Entwicklung und die Produktion von Dieselmotoren. Wegen des Diesel-typisch höheren Drucks in den Zylindern muss die Konstruktion des Motors deutlich stabiler ausfallen als bei Otto-Motoren. Die Herstellung eines modernen Dieselmotors ist daher etwa doppelt so teuer wie die Herstellung eines Benzinmotors. 33

Mit erheblichem technischen Aufwand und damit Entwicklungs- und Produktionskosten verbunden ist ferner die Regulierung des Schadstoffausstoßes bei Dieselmotoren. Sowohl der Partikelausstoß als auch der Ausstoß von Stickoxiden sind bei einem Dieselmotor bauartbedingt erheblich höher als bei einem Benzinmotor mit 3-Wege-Katalysator. 34

Vor dem Hintergrund dieser Kostennachteile der Dieseltechnik, ihres gleichzeitig aber großen Potentials mit Blick auf Langlebigkeit und Verbrauch, bestand (und besteht) die große Herausforderung für die Hersteller von Beginn an in der Weiterentwicklung der Dieseltechnologie hin zu einer kostengünstigen und vor allem schadstoffarmen Antriebstechnik. 35

**(2)   Emissionsgrenzwerte in Europa und den USA**

Das Hauptaugenmerk gesetzgeberischer und verwaltungsbehördlicher Tätigkeit auf dem Gebiet der Dieseltechnologie liegt seit einigen Jahren verstärkt auf der Regulierung des Schadstoffausstoßes von Diesel-Pkw mittels gesetzlicher Grenzwerte, unter anderem Grenzwerte für Stickoxidemissionen. 36

Das nachfolgende Schaubild zeigt die gesetzgeberischen Entwicklungen, und hier insbesondere die Verschärfung der Grenzwerte nach US-Recht. Es handelt sich hierbei um eine vereinfachte Darstellung. Die Regulierung der Emissionsgrenzwerte in den USA ist nicht unmittelbar vergleichbar mit ihrem 37

Gegenstück in der Europäischen Union. Die Details (Betrachtung der Fahrzeugflotte im Gegensatz zum Einzelfahrzeug, unterschiedliche Testzyklen) sind nicht entscheidend. Entscheidend ist, dass die Beklagte sich einer drastisch verschärften Gesetzgebung gegenübersah, die sie vor enorme technische und finanzielle Herausforderungen stellte.

**NOx-Grenzwerte für Diesel-Pkw in g/km**



| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EU | 0,500 | 0,500 | 0,500 | 0,500 | 0,500 | 0,250 | 0,250 | 0,250 | 0,250 | 0,250 | 0,250 | 0,250 | 0,250 |
| Japan | 0,400 | 0,400 | 0,300 | 0,300 | 0,300 | 0,150 | 0,150 | 0,150 | 0,150 | 0,150 | 0,150 | 0,150 | 0,150 |
| USA (Tier 2: Bin 5) | 0,776 | 0,776 | 0,776 | 0,776 | 0,043 | 0,043 | 0,043 | 0,043 | 0,043 | 0,043 | 0,043 | 0,043 | 0,043 |

Umweltbundesamt, Future Diesel – Abgasgesetzgebung Pkw, leichte Nutzfahrzeuge und Lastkraftwagen – Fortschreibung der Grenzwerte bei Dienstfahrzeugen, Berlin, Juli 2003, S. 12.

(a)     Entwicklungen in den USA ab dem Jahr 2000

Die in den USA geltenden NOx-Grenzwerte gehen auf die Normsetzung der *EPA* zurück. Diese Vorgaben gelten für alle Bundesstaaten der USA, in denen nicht die noch strengeren Vorschriften des *CARB* Vorrang haben. 38

Während in den Jahren 2000 bis 2003 die von der *EPA* vorgegebenen NOx-Grenzwerte durchgehend bei ca. 800 mg/km lagen, fand zum Anfang des Jahres 2004 eine drastische Verschärfung statt. Die Grenzwerte wurden zum genannten Zeitpunkt um mehr als 90 % auf nur noch knapp 70 mg/km abgesenkt. Angesichts dieses radikalen Einschnitts bestimmte die *EPA* zu Gunsten der Fahrzeughersteller eine <u>Übergangsphase</u>, während derer die neu festgesetzten Grenzwerte sukzessive zu erfüllen waren. Dieses sogenannte „Phase-In" sah vor, dass in dem Einführungsjahr der neuen Grenzwerte 39

(2004) lediglich 25 % der Fahrzeugflotte eines Herstellers den neuen Schadstoffvorgaben entsprechen musste. In jedem darauffolgenden Jahr sollte die Anzahl der grenzwertkonformen Fahrzeuge eines Herstellers um weitere 25 % steigen, so dass ab dem Jahr 2007 die Grenzwerte für jedes Fahrzeug einzuhalten waren.

(b)   Entwicklungen in Europa ab dem Jahr 2000

In Europa lagen die $NO_x$-Grenzwerte in der Zeit von 2000 bis 2004    40 mit 500 mg/km bereits deutlich unter dem ursprünglichen US-amerikanischen Standard. Wie aus dem obigen Schaubild erkennbar ist, fand eine weitere Absenkung der Grenzwerte zum Jahr 2005 durch die europaweite Einführung der EURO 4 Norm statt. Insoweit wurde der zulässige $NO_x$-Grenzwert auf 250 mg/km halbiert. Bis zum Jahr 2015 (EURO 6 Norm) wurde der $NO_x$-Grenzwert weiter bis auf die derzeit geltenden 80 mg/km abgesenkt.

**b)   Die Idee der Abgasmanipulation und deren technische Umsetzung**

(1)   Angesichts verschärfter Grenzwerte muss dem Vorstand der Beklagten in den    41 Jahren 2005 und 2006 bewusst geworden sein, dass die von der Beklagten produzierten Diesel-Pkw bei gleichbleibender Soll-Leistung die neuen Schadstoffgrenzwerte nicht einhalten können und zwar weder in Europa, noch (und erst recht nicht) in den USA.

(a)   Die kostengünstigste Lösung des Grenzwertproblems sah die Beklagte    42 darin, in die elektronische Steuerung des seinerzeit in den Diesel-Pkw einzig verbauten Motorenmodells EA189 einzugreifen.

| | | |
|---|---|---|
| **Beweis:** | 1. | Zeugnis des Herrn Dr. Ulrich Hackenberg, Sankt-Gangolf-Straße 15, 85139 Wettstetten |
| | 2. | Zeugnis des Herrn Dr. Jens Hadler, zu laden über die Universität Magdeburg, Institut für Mobile Systeme, Universitätsplatz 2, 39106 Magdeburg |
| | 3. | Zeugnis des Herrn Falko Rudolph, zu laden über die Beklagte |

06788-00001/21141329.68           37           Klage vom 20. Juni 2016
CalSTRS u.a. ./. Volkswagen AG
LG Braunschweig, Az. neu

4.  Zeugnis des Herrn Dr. Wolfgang Hatz, zu laden über die Beklagte

Zum Hintergrund und zu den weiteren Einzelheiten der technischen Entwicklung können die vorstehend als Zeugen benannten Personen aufgrund ihrer Funktion bei der Beklagten in der Zeit ab 2005/2006 Auskunft geben.

43

(b)  Die Manipulation der Steuerungssoftware erfolgte mittels einer von der *Robert Bosch GmbH* (*Bosch*) zu Testzwecken gelieferten Software. Zur Lieferung dieser Software an die Beklagte und deren Zweck können insbesondere die Geschäftsführer von *Bosch* Auskunft geben.

44

**Beweis:**   1.  Zeugnis des Herrn Dr. Werner Struth, Geschäftsführer der Robert Bosch GmbH, Robert-Bosch-Platz 1, 70839 Gerlingen-Schillerhöhe

2.  Zeugnis des Herrn Dr. Rolf Bulander, Geschäftsführer der Robert Bosch GmbH, Robert-Bosch-Platz 1, 70839 Gerlingen-Schillerhöhe

Zur weiteren Orientierung der Kammer überreichen wir als

45

**- Anlage K 16 -**

eine Pressemitteilung von *Bosch* vom 24. September 2015, die sich mit der Lieferung der Software an die Beklagte befasst.

Die von Bosch stammende Software war selbst nicht für Abgasmanipulationen entwickelt worden, vielmehr wurde sie von der Beklagten missbräuchlich verändert.

46

(c)  Wie sich zwischenzeitlich herausgestellt hat, entstand die Idee diese Software zu Manipulationszwecken zu verwenden bereits im Jahr 1999. Sie stammte offenbar von Motorenentwicklern der *Audi AG*, wie sich aus einem als

47

**- Anlage K 17 -**

überreichten Pressebericht des *Handelsblattes* vom 20. April 2016 ergibt.

(d)    Die als „Acoustic mode" bezeichnete Einrichtung diente ursprünglich   48 dazu, das für Dieselmotoren typische Klopfgeräusch zu minimieren. Damit einher ging aber auch eine Erhöhung der Emissionen. Durch eine Veränderung der Software sollte dieser Effekt vor dem Hintergrund geltender Emissionsstandards verhindert werden.

> **Beweis:**    1.   Zeugnis des Herrn Dr. Ulrich Hackenberg, b.b.
> 2.   Zeugnis des Herrn Dr. Jens Hadler, b.b.
> 3.   Zeugnis des Herrn Falko Rudolph, b.b.
> 4.   Zeugnis des Herrn Dr. Wolfgang Hatz, b.b.
> 5.   Zeugnis des Herrn Dr. Wolfgang Bernhard, zu laden über die Daimler AG, Mercedesstraße 137, 70327 Stuttgart

Unbestritten gebliebenen Pressemeldungen zufolge, vgl. etwa den   49 Bericht der *Frankfurter Allgemeinen Zeitung* vom 27. September 2015, überreicht als

> **- Anlage K 18 -,**

hatte *Bosch* die Beklagte bereits im Jahr 2007 in einem Schreiben vor dem illegalen Einsatz der Software gewarnt.

> **Beweis:**    1.   Zeugnis des Herrn Dr. Werner Struth, b.b.
> 2.   Zeugnis des Herrn Dr. Rolf Bulander, b.b.

(2)    Mit Hilfe der von der Beklagten manipulierten Software war es möglich, die   50 Abgaswerte von Diesel-Pkw auf dem Prüfstand derart zu „optimieren", dass die gesetzlichen $NO_x$-Grenzwerte scheinbar eingehalten wurden. Die Software regelt die Funktion der (ebenfalls von *Bosch* an die Beklagte gelieferten) Electronic Diesel Control (*EDC17*), eines elektronischen Steuergerätes für Dieselmotoren. Die *EDC17* steuert unter anderem Partikelfilter und Systeme zur Stickoxid-Reduktion. Stickoxide werden hierbei durch einen Katalysator unter Verwendung einer Harnstofflösung (*Adblue*) in Wasser und Stickstoff umgewandelt.

06788-00001/21141329.68            39            Klage vom 20. Juni 2016
CalSTRS u.a. ./. Volkswagen AG
LG Braunschweig, Az. neu

Die von der Beklagten installierte Software erkennt neben normalen 51
Fahrsituationen auch Prüfsituationen. In einer Prüfsituation steigert die
Software den Einsatz von *Adblue*, optimiert die Abgasaufbereitung und
reduziert so den Stickoxidausstoß. Im normalen Fahrbetrieb hingegen wird
die softwaregestützte Abgaskontrollanlage teilweise außer Betrieb gesetzt,
weshalb die Stickoxidemissionen dann erheblich höher ausfallen; vgl. dazu
das Schreiben der *EPA* vom 2. November 2015 an die Beklagte (*Notice of
Violation II*, dort S. 4 f.), vorgelegt als

**- Anlage K 19 -.**

**3.** **Bewusster Einsatz der Manipulationssoftware ab dem Jahr 2008 und hierauf
basierender Erfolg der Beklagten insbesondere auf dem US-Dieselmarkt**

**a)** **Abgesetzte Fahrzeuge mit manipulierten Abgaswerten**

(1) Die Software zur Verfälschung von Diesel-Abgaswerten wurde nach 52
Angaben eines geständigen Mitarbeiters der Beklagten und (derzeit öffentlich
nicht namentlich bekannten) Kronzeugen ab November 2006 in der Abteilung
Motorentechnik der Beklagten besprochen und im Zusammenhang mit dem
Dieselmotor des Typs EA189 von der Beklagten spätestens ab dem Jahr 2008
weltweit in insgesamt ca. 11 Millionen Fahrzeugen eingesetzt. Der größte
Anteil hiervon entfiel auf den europäischen Markt mit insgesamt ca.
8,5 Millionen manipulierten Fahrzeugen (davon ca. 2,4 Millionen
manipulierte Fahrzeuge in Deutschland ab 2009).

In den USA wurden nach Schätzungen der *EPA* seit 2008 knapp eine halbe 53
Million manipulierte Fahrzeuge der Beklagten abgesetzt. Wir verweisen auf
die Pressemitteilung der *EPA* vom 18. September 2015, vorgelegt als

**- Anlage K 20 -.**

(2) Als Anlage 54

**- Anlage K 21 -**

überreichen wir eine Kopie der Klage des Justizministeriums der Vereinigten
Staaten (*U.S. Department of Justice - DOJ*) vom 4. Januar 2016 (dazu noch

näher unter III.1.c)(1), **Rn. 95**). Aus den Feststellungen des DOJ ergibt sich die Zahl von 580.000 auf dem US-amerikanischen Markt abgesetzten Dieselfahrzeuge der Beklagten und ihrer Konzernunternehmen. Eine Übersicht der betroffenen Modelle überreichen wir als

- **Anlage K 22 -**.

Um die unternehmerischen Entscheidungen zum Vertrieb der jeweils betroffenen Fahrzeugmodelle besser einordnen zu können, haben wir die in Anlage K 22 enthaltene Übersicht nach Modelljahren (auf dem US-amerikanischen Fahrzeugmarkt gleichbedeutend mit dem Begriff „Baujahr") geordnet. Das Modelljahr bei Kraftfahrzeugen ist dabei nicht vollständig deckungsgleich mit dem tatsächlichen kalendarischen Produktionsjahr. In der Fahrzeugindustrie wird ganz regelmäßig mit der Produktion und dem Vertrieb von Pkw eines nominellen Modelljahres bereits in der zweiten Hälfte des vorangehenden Kalenderjahres begonnen. Fahrzeuge des Modelljahres 2013 werden also beispielsweise bereits im dritten bzw. vierten Quartal des Kalenderjahres 2012 produziert und vertrieben. 55

Die Beklagte beginnt mit dem Vertrieb ihrer Fahrzeuge eines Modelljahres üblicherweise zwischen August und September des jeweiligen, dem Modelljahr vorangehenden Jahres; vgl. dazu exemplarisch für das Modelljahr 2016 die Pressemitteilung der *VWGoA* vom 5. August 2015, überreicht als 56

- **Anlage K 23 -**.

b)   **Die jeweilige Entscheidung, die Manipulationssoftware in den Diesel-Pkw der einzelnen Modelljahre zu verwenden**

Mit der Produktion und dem Inverkehrbringen der Diesel-Pkw eines jeden Modelljahres hat sich die Beklagte bewusst für den weiteren Einsatz der oben beschriebenen Manipulationssoftware entschieden. Das hat die Beklagte nicht getan, obwohl ihr dies ohne Weiteres möglich gewesen wäre. 57

**Beweis:**
1. Zeugnis des Prof. Dr. Martin Winterkorn, b.b.
2. Zeugnis des Herrn Dr. Heinz-Jakob Neußer, Neuhaldenstraße 47, 70825 Korntal-Münchingen, Korntal
3. Zeugnis des Herrn Dr. Ulrich Hackenberg b.b.
4. Zeugnis des Herrn Dr. Wolfgang Hatz, b.b.
5. Zeugnis des Herrn Falko Rudolph, b.b.
6. Zeugnis des Herrn Dr. Jens Hadler, b.b.
7. Zeugnis des Herrn Michael Horn, b.b.

Die Vorgenannten waren bei der Beklagten als damalige Vorstandsmitglieder, Leiter der Aggregatentwicklung oder Leiter der Entwicklungsabteilung von Dieselmotoren im relevanten Zeitraum tätig (siehe Organigramm unter I.2.b), **Rn. 9**) und daher mit der Thematik Modellpflege befasst. Herr *Michael Horn* war darüber hinaus CEO der *VWGoA* und damit insbesondere mit Blick auf den US-Markt für Modellpflegeentscheidungen zuständig. Es ist daher davon auszugehen, dass die genannten Personen Auskunft über (erfolgte bzw. unterbliebene) Modellpflegemaßnahmen geben können.  58

**c)   Herausragende Stellung der Beklagten auf dem US-Markt für Diesel-Pkw**

Spätestens ab dem Jahr 2008 erreichte die Beklagte mit Hilfe der manipulierten Abgaswerte insbesondere auf dem US-amerikanischen Markt für Diesel-Pkw eine führende Stellung.  59

So wurde im November 2008 das Modell *Jetta TDI Clean Diesel* der Beklagten auf der Auto Show in Los Angeles als „Green Car of the Year" ausgezeichnet. Die Beklagte erklärte daraufhin in ihrem Geschäftsbericht 2008 (S. 289), den wir mit entsprechend hinzugefügten Hervorhebungen auszugsweise als  60

**- Anlage K 24 -**

vorlegen, dass die von ihr entwickelte „Clean Diesel"-Technologie zu den emissionsärmsten Dieseltechnologien der Welt gehöre. Die Erfüllung der restriktiven Grenzwertgesetzgebung, insbesondere in den USA, wurde als großer Erfolg gefeiert.

Auch in den Folgejahren war die Beklagte mit ihren Diesel-Pkw auf dem US-amerikanischen Fahrzeugmarkt erfolgreich. Wie sich aus der auf der Webseite *www.automobil-produktion.de* veröffentlichten Statistik über Pkw-Dieselzulassungen auf dem US-Markt, überreicht als  61

- **Anlage K 25** -,

ergibt, lag der Marktanteil der Diesel-Pkw der Beklagten bereits ab dem Jahr 2010 erheblich über dem anderer Fahrzeughersteller; im Jahr 2014 lag der Marktanteil der Beklagten bei Diesel-Pkw in den USA sogar deutlich über 80 %.

**Beweis:**     Sachverständigengutachten

Auch der Geschäftsbericht der Beklagten für das Jahr 2010, im Auszug vorgelegt als    62

- **Anlage K 26** -,

bestätigt den frühen Erfolg von US-Diesel-Pkw der Marke Volkswagen – dort wurde in diesem Zusammenhang erklärt (S. 106):

> *„Auf dem nordamerikanischen Pkw-Markt lag der Absatz von Konzernfahrzeugen bei 0,6 Mio.; der Anstieg um 22,8 % war im Vergleich zum Gesamtmarkt deutlich überproportional. Die Umsatzerlöse verbesserten sich um 33,3 % auf 15,2 Mrd. €.“*

Diese Entwicklung setzte sich in den Folgejahren fort. So erklärt der    63
Geschäftsbericht der Beklagten für das Jahr 2011, auszugsweise vorgelegt als

- **Anlage K 27** -,

auf S. 110:

> *„Auf dem nordamerikanischen Markt setzten wir 0,7 Mio. Konzernfahrzeuge ab (+22,2 %) und entwickelten uns damit erneut besser als der Gesamtmarkt. Die Umsatzerlöse nahmen um 15,5 % auf 17,6 Mrd. € zu.“*

Auch Aussagen im Geschäftsbericht der Beklagten für das Jahr 2012, auszugsweise    64
vorgelegt als

- **Anlage K 28** -,

machen ihr Wachstum auf dem US-Fahrzeugmarkt – das ganz entscheidend auch mit den gestiegenen Absatzzahlen im Dieselbereich in Verbindung zu sehen ist – deutlich (S. 104):

> *„Mit einem Zuwachs von 32,2 % auf 0,9 Mio. Einheiten entwickelte sich der Konzern in Nordamerika erneut besser als der Gesamtmarkt.“*

Das aufgezeigte Wachstum und die bis hin zur absoluten Dominanz gestiegenen   65
Absatzzahlen der Beklagten auf dem US-Markt für Diesel-Pkw ließen sich ohne die
bekannten Abgasmanipulationen nicht denken. Dies gilt insbesondere dann, wenn
man berücksichtigt, dass die Beklagte keine besonderen Entwicklungskosten
aufgewendet hat, um diese Marktstellung zu erreichen. Dies belegt die nachfolgende
Übersicht zur Entwicklung der Forschungs- und Entwicklungskosten im
Konzernbereich Automobile der Beklagten, deren Inhalt auf den jeweiligen
Aussagen in den Geschäftsberichten der Beklagten basiert. Außerordentliche
Steigerungen der Forschungs- und Entwicklungskosten in den Jahren 2004 bis 2006
sind danach nicht erkennbar.

**Forschungs- und Entwicklungskosten im Konzernbereich Automobile der Beklagten**

| Mio. € | 2010 | 2009 | 2008 | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|---|---|---|
| Forschungs- und Entwicklungskosten gesamt | 6.257 | 5.790 | 5.926 | 4.923 | 4.240 | 4.075 | 4.164 | 4.137 |
| Veränderung in % | 8,1 | -2,3 | 20,4 | 16,1 | 4,0 | -2,1 | 0,1 | - |

Vorstehende Informationen sind den Geschäftsberichten der Beklagten entnommen,   66
die wir auszugsweise als

- **Anlage K 29** -

überreichen. Die Angaben finden sich auf den folgenden Seiten:

| Geschäftsbericht | Seite |
|---|---|
| 2004 | 24 |
| 2005 | 82 |
| 2006 | 88 |
| 2007 | 149 |
| 2008 | 151 |
| 2009 | 163 |
| 2010 | 185 |

d)   **Kenntnis des Vorstands der Beklagten von den Manipulationen spätestens am
30. September 2008**

Anstelle technischer Innovation waren primär Softwaremanipulationen für den   67
Erfolg der Dieseltechnologie der Beklagten verantwortlich. Denn nur die
manipulierten Abgaswerte haben den Marktzutritt der Dieselfahrzeuge in den USA
sichern können. Ansonsten wären diese Fahrzeuge nicht verkehrsfähig gewesen. Dies

konnte den Vorstandsmitgliedern und der Führungsebene des Konzerns nicht verborgen bleiben.

(1)    Die Beklagte hatte sich im Jahr 2005 zum Ziel gesetzt, ihrer Konzernmarke    68
       eine dominierende Stellung auf dem weltweiten Markt für Diesel-Pkw zu
       sichern; vgl. S. 25 des Geschäftsberichts 2006 (Anlage K 29). In einer
       Pressemitteilung vom 2. März 2016 (Anlage K 8) erklärt die Beklagte erneut,
       sie habe ab dem Jahr 2005 die strategische Entscheidung getroffen, in den
       USA eine groß angelegte Dieseloffensive zu starten.

       Mit Blick auf die ab dem Jahre 2004 drastisch verschärften Abgasgrenzwerte    69
       für Diesel-Pkw konnte dieses Vorhaben jedoch nur Erfolg haben, wenn es der
       Beklagten gelingen würde, den Schadstoffausstoß der Dieselmotoren radikal
       zu verringern.

       Dies räumt die Beklagte selbst ein, wenn sie in ihrer Pressemitteilung vom    70
       2. März 2016 (Anlage K 8) die Herausforderungen betont, denen sich die
       Ingenieure und Techniker bei der Entwicklung einer Dieseltechnik, die den
       strengen in den USA geltenden Abgaswerten genügt, damals gegenüber
       sahen.

       Die Beklagte ging dabei von dem ehrgeizigen Ziel einer *Halbierung* des    71
       damaligen Schadstoffausstoßes ihrer Diesel-Fahrzeuge aus, vgl. S. 76 des
       Geschäftsberichts 2004 der Beklagten (Anlage K 29):

              *„Übertragen auf unsere Fahrzeuge mit Dieselmotoren bedeutet das,*
              *alle gasförmigen Schadstoffe [...] und die Partikelemissionen*
              *gegenüber der Abgasstufe Euro 3* ***um 50 %*** *zu senken*
              *[...]."* (Hervorhebung durch die Unterzeichnerin).

(2)    Entsprechend plausibel erscheint es, dass nach dem bereits erwähnten    72
       Kronzeugen in der Abgasaffäre die Motorenentwickler der Konzernmarke der
       Beklagten Ende des Jahres 2006 von der Konzernspitze unter enormem Druck
       gesetzt wurden, einen sauberen Diesel-Motor zu präsentieren – und zwar
       schnell und günstig. Hierzu überreichen wir einen *Bericht des NDR* vom
       22. Januar 2016 als

- **Anlage K 30** -.

Darüber hinaus bieten wir an

**Beweis:**    1.   Zeugnis des Herrn Dr. Ulrich Hackenberg, b.b.
2.   Zeugnis des Herrn Dr. Wolfgang Hatz, b.b.
3.   Zeugnis des Herrn Falko Rudolph, b.b.
4.   Zeugnis des Herrn Dr. Jens Hadler, b.b.

Aufgrund ihrer oben bereits aufgezeigten Stellung bei der Beklagten können     73
die vorgenannten Personen Auskunft über den Druck geben, unter dem sie als
Leiter der entsprechenden Abteilungen standen.

(3)    Eine solche „Schadstoffrevolution" der Dieseltechnologie auf technischer     74
Ebene war für die Motorenentwickler der Beklagten bei verständiger
Betrachtung – jedenfalls ohne eine erhebliche Erhöhung der vom
Konzernvorstand zur Verfügung gestellten Entwicklungsmittel – nicht
realisierbar.

**Beweis:**    Sachverständigengutachten

Wie heute bekannt ist, nahm die Beklagte auch tatsächlich keine technischen     75
Änderungen an den Dieselaggregaten vor, um die NO$_x$-Grenzwerte
nachhaltig im Alltagsfahrbetrieb einzuhalten. Trotzdem erfüllten die Diesel-
Fahrzeuge der Beklagten ab dem Jahre 2008 (plötzlich, jedoch, wie heute
bekannt, nur scheinbar) die neuen, besonders strengen Schadstoffgrenzwerte,
insbesondere in den USA.

(4)    Dieser Umstand und das daran anknüpfende, auffällig erfolgreiche Agieren     76
der Beklagten auf dem US-Dieselmarkt musste den zwischen 2007 und 2013
amtierenden *Entwicklungsvorstand* der Pkw-Marke der Beklagten, *Dr. Ulrich
Hackenberg* überraschen; siehe dazu auch den als

- **Anlage K 31** -

überreichten Pressebericht des *Handelsblattes* vom 24. September 2015.

Es musste für ihn jedenfalls ab Mitte/Ende des Jahres 2008 (der Zeitraum, in     77
dem die neue Modellreihe 2009 präsentiert und der *Jetta TDI Clean Diesel*

zum „Green Car of the Year" gekürt wurde) auf der Hand liegen, dass eine Grenzwerterfüllung der neuen Diesel-Pkw der Beklagten in den USA mangels neuer technischer Entwicklungen ausgeschlossen war. Sie konnte daher nur mittels eines manipulativen Vorgehens erreicht worden sein. Entsprechendes Handeln musste Herr *Dr. Hackenberg* angesichts der beschriebenen, nicht anders erklärbaren Entwicklungen und Erfolge zumindest für konkret möglich gehalten haben.

**Beweis:**     Zeugnis des Herrn Dr. Ulrich Hackenberg, b.b.

(5)     Dem von 2007 bis 2012 amtierenden Leiter der Motorenentwicklung der     78
Beklagten *Dr. Wolfgang Hatz* hätte sich ein solcher Verdacht nicht nur aufdrängen müssen. Nach der Lebenserfahrung muss Herr *Dr. Hatz* an den Manipulationen angesichts seiner Funktion im Unternehmen der Beklagten beteiligt gewesen sein. Herr *Dr. Hatz* hatte danach spätestens zum 31. Dezember 2007 Kenntnis von den Abgasmanipulationen der Beklagten.

**Beweis:**     Zeugnis des Herrn Dr. Wolfgang Hatz, b.b.

(6)     Der damalige Leiter der Aggregatentwicklung der Marke Volkswagen     79
*Dr. Jens Hadler* hatte bereits zum 31. Dezember 2007 Kenntnis von den Abgasmanipulationen der Beklagten. Als Verantwortlicher für die Motorenentwicklung muss er gewusst haben, dass die $NO_x$-Grenzwerte nicht durch technische Verbesserungen der Motoren eingehalten wurden, sondern lediglich die Testergebnisse die tatsächlichen Emissionen durch Softwaremanipulationen verdeckten.

**Beweis:**     Zeugnis des Herrn Jens Hadler, b.b.

(7)     Auch der damalige Leiter der Diesel-Aggregatentwicklung der Beklagten     80
*Falko Rudolph* hatte ebenfalls bereits zum 31. Dezember 2007 Kenntnis von den Abgasmanipulationen der Beklagten. Es widerspricht jeder Lebenserfahrung, dass der für die Entwicklung der Dieselmotoren Verantwortliche deren Emissionseigenschaften nicht kannte.

**Beweis:**     Zeugnis des Herrn Falko Rudolph, b.b.

(8)     Aber auch der Konzernvorstand der Beklagten, namentlich der frühere      81
Vorstandsvorsitzende *Prof. Dr. Martin Winterkorn*, musste angesichts der
beschriebenen Ungereimtheiten im Zusammenhang mit dem plötzlichen
Durchbruch der Beklagten auf dem Gebiet schadstoffarmer Dieselantriebe
manipulative Ursachen zumindest für konkret möglich gehalten und den
Verkauf entsprechender Fahrzeuge gleichwohl gebilligt haben.

**Beweis:**     Zeugnis des Herrn Prof. Dr. Martin Winterkorn, b.b.

Es      erscheint     lebensfremd,     dass     der     Vorstandsvorsitzende     und      82
Konzernvorstand sich ungeachtet der sich geradezu aufdrängenden
Verdachtsmomente nicht bei den Herren *Dr. Hackenberg* und *Dr. Hatz* über
die Ursachen der gravierenden, raschen und entwicklungskostenarmen
Fortschritte und Markterfolge der Beklagten erkundigt hatte. Es ist weiter
lebensfremd, dass ihm hierbei keinerlei oder falsche (aber ihn dennoch
zufriedenstellende) Auskünfte gegeben wurden.

(9)     Hierzu passt auch, dass sich der *Verband der Deutschen Automobilindustrie*      83
(*VDA*), zu dessen Vorstand seit 2007 auch Herr *Prof. Dr. Winterkorn* gehörte,
schon ab dem Jahr 2007 mit Vorwürfen der *Deutsche Umwelthilfe e.V.*
(*DUH*) auseinanderzusetzen hatte, die die Richtigkeit der von der deutschen
Automobilindustrie kommunizierten Abgaswerte ihrer Fahrzeuge betrafen.

So wies die *DUH* bereits am 12. September 2007 auf „*Betrug*" der      84
Automobilhersteller bei der Ermittlung von Abgaswerten insbesondere durch
die Verwendung von Abschalteinrichtungen hin. Die *DUH* forderte
insbesondere, Abgasuntersuchungen durch Endrohrmessungen vorzunehmen
und diese nicht zu Gunsten sogenannter „*on board diagnostics*" den
Herstellern selbst zu überlassen. In einem am 10. Februar 2011 im
Bundesverkehrsministerium stattfindenden Gespräch kritisierte die *DUH*
erneut den Einsatz von Abschalteinrichtungen bei der Zykluserkennung. Das
Ministerium entgegnete hierauf, das Problem zu kennen. Zum Nachweis
nehmen wir Bezug auf die Pressemitteilung der *DUH* vom 29. September
2015 („Der Kniefall der Bundesregierung vor den Autokonzernen – eine
Chronologie des Abgas-Skandals"), vorgelegt als

- Anlage K 32 -.

Es liegt nahe, dass auch Herr *Prof. Dr. Winterkorn* sich als damaliges (2007)    85
*VDA*-Vorstandsmitglied mit den genannten Vorwürfen der *DUH*
auseinandergesetzt hat und ihm vor dem Hintergrund der aus obigen Gründen
bereits naheliegenden Verdachtsmomente die manipulativen Eingriffe in
Abgasmessungen bei Diesel-Pkw der Beklagten vollends bewusst waren.

(10)    Der Konzernvorstand, insbesondere der frühere Vorstandsvorsitzende der    86
Beklagten *Prof. Dr. Winterkorn*, muss nach alledem also spätestens mit
Einführung der Diesel-Pkw des Modelljahres 2009 der Beklagten auf dem
US-Markt Kenntnis von den streitgegenständlichen Manipulationen gehabt
haben. Zumindest muss er entsprechende Praktiken für möglich gehalten
haben.

Ungeachtet der Kenntnis der Konzernleitung sowie leitender Mitarbeiter der    87
Beklagten von den beschriebenen Manipulationspraktiken hat diese es versäumt, die
Öffentlichkeit und den Kapitalmarkt zeitnah über diese von ihr initiierten und
praktizierten Rechtsverstöße zu informieren.

### III.
### Die Bedeutung und Konsequenzen des Abgasskandals für die Beklagte und deren Aktionäre

**1.**    **Andauernde Untersuchung und Sanktionierung der Abgasmanipulationen in verschiedenen Ländern der EU**

**a)**    **Staatsanwaltschaftliche Ermittlungen**

(1)    Am 8. Oktober 2015 durchsuchte die Staatsanwaltschaft bei dem Landgericht    88
Braunschweig unter anderem die Zentrale der Beklagten in Wolfsburg.
Erklärtes Ziel der Durchsuchung war die Sicherstellung von Unterlagen und
Datenträgern, die Aufschluss über die genaue Vorgehensweise und die
Identität der an der Manipulation beteiligten Mitarbeiter geben können. Die
entsprechende Pressemitteilung der Staatsanwaltschaft Braunschweig vom
8. Oktober 2015 überreichen wir als

06788-00001/21141329.68                     49                     Klage vom 20. Juni 2016
CalSTRS u.a. ./. Volkswagen AG
LG Braunschweig, Az. neu

- Anlage K 33 -.

(2)  Am 24. November 2015 wurde ein Ermittlungsverfahren wegen des 89
Verdachts auf Steuerhinterziehung in Millionenhöhe gegen fünf Mitarbeiter
der Beklagten eingeleitet. In diesem Zusammenhang wird darauf verwiesen,
dass aufgrund der manipulationsbedingt verfälschten Abgaswerte
entsprechend unzutreffende Kraftfahrzeug-Steuerbescheide an die
Fahrzeughalter ergangen seien. Einen Bericht des *Norddeutschen Rundfunks*
vom 24. November 2015 überreichen wir als

- Anlage K 34 -.

(3)  Nach den von der Staatsanwaltschaft Braunschweig bestätigten 90
Presseberichten vom 8. Juni 2016 führt die Staatsanwaltschaft ein
Ermittlungsverfahren gegen einen hochrangigen Justiziar der Beklagten
wegen des Anfangsverdachts der versuchten Strafvereitelung und
Urkundenunterdrückung. Der nunmehr freigestellte Mitarbeiter der
Rechtsabteilung soll mehreren Kollegen bereits im August 2015
unmissverständlich nahegelegt haben, bestimmte Daten beiseitezuschaffen.
Den Bericht der *Süddeutschen Zeitung* überreichen wir als

- Anlage K 35 -.

b)  **Verwaltungsbehördliche Maßnahmen in Deutschland**

(1)  Im September 2015, unmittelbar im Anschluss an das Bekanntwerden der 91
Dieselmanipulationen, setzte Bundesverkehrsminister *Alexander Dobrindt*
eine achtköpfige Kommission zur Untersuchung des Skandals ein. Außerdem
wies er das Kraftfahrt-Bundesamt (*KBA*) an, die Dieselmodelle der Beklagten
umgehend strengen Nachprüfungen durch unabhängige Gutachter zu
unterziehen. Für die Einzelheiten verweisen wir auf die entsprechenden
Mitteilungen des Bundesverkehrsministeriums,

- Anlage K 36 -.

(2)  Als Konsequenz entsprechender Nachprüfungen ordnete das *KBA* gegenüber 92
der Beklagten mit Schreiben vom 15. Oktober 2015 allein für Deutschland

den Rückruf von 2,4 Millionen VW-Markenfahrzeugen an. Dies ergibt sich aus der als

**- Anlage K 37 -**

überreichten Pressemitteilung des *KBA* vom 16. Oktober 2015. Danach geht das KBA davon aus, dass es sich bei der von der Beklagten eingesetzten Manipulationssoftware um eine unzulässige Abschalteinrichtung (vgl. Art. 5 Abs. 2 VO 715/2007) handelt.

(3)   Mit Bescheid vom 5. November 2015 ordnete das *KBA* an, dass unter seiner     93
Aufsicht zu allen von der Abgasmanipulation betroffenen Fahrzeugmodellen die Schadstoffemissions-, Kraftstoffverbrauchs- und $CO_2$-Emissionswerte neu ermittelt werden. Die entsprechende Pressemitteilung des *KBA* überreichen wir als

**- Anlage K 38 -**.

(4)   Schließlich untersucht das *KBA* seit Ende September 2015, ob im Markt     94
möglicherweise weitere Manipulationen des Schadstoffausstoßes, insbesondere bei Stickoxiden (NOx), stattfinden. Überprüft werden dabei insbesondere Fahrzeuge der Beklagten, wie sich aus der als

**- Anlage K 39 -**

überreichten Pressemitteilung des *KBA* vom 11. November 2015 ergibt.

c)   **Sanktionen in den USA**

(1)   Am 4. Januar 2016 erhob das Justizministerium der Vereinigten Staaten     95
(*DOJ*) im Auftrag der *EPA* Zivilklage gegen die Beklagte und deren Tochterunternehmen (u.a. *Audi AG* und *VWGoA*) (Anlage K 21). Ihnen wird vorgeworfen, sie hätten etwa 580.000 ihrer Diesel-Pkw in den USA mit illegaler Manipulationssoftware ausgestattet und damit die Einhaltung gesetzlicher Abgasgrenzwerte vorgespiegelt. Die Beklagte habe die Verbraucher in betrügerischer Absicht getäuscht und der Luftverschmutzung Vorschub geleistet. Das *DOJ* beantragt in der Klageschrift u. a. die Anordnung von Maßnahmen zur Wiedergutmachung des überhöhten

Stickoxidausstoßes sowie Strafen in Höhe von insgesamt bis zu etwa USD 47 Milliarden. Diese ergeben sich aus einer Strafe von USD 78.750 pro Fahrzeug zuzüglich eines Betrages, der sich nach der Dauer des Gesetzesverstoßes bemisst.

(2) Das *DOJ* führt zur Begründung an, die Beklagte habe durch die Manipulation    96
von Abgaswerten mehrere Vorschriften des *Clean Air Act* (CAA) verletzt (42. Titel der Sammlung des US-Bundesrechts: 42 U.S.C. § 7522 = § 203 CAA). Konkret wirft das *DOJ* der Beklagten die Verletzung von vier Vorschriften des CAA vor: das Inverkehrbringen von Fahrzeugen ohne gültige Konformitätsbescheinigung (*Certificate of Conformity*, 42 U.S.C. § 7522(a)(1)), das Inverkehrbringen von Fahrzeugen mit einem *Defeat Device* bzw. einer Abschalteinrichtung (42 U.S.C. § 7522(a)(3)(A) und (B)) sowie die Vorenthaltung bestimmter für die Erteilung der Konformitätsbescheinigung relevanter Informationen gegenüber der EPA (42 U.S.C. § 7522(a)(2)). Diese Tatbestände hat die Beklagte bereits mit dem Beginn der Dieselmanipulationen erfüllt. Jeder der Tatbestände ist nach dem CAA Grundlage für erhebliche Strafen. Eine Strafzumessung auf Basis einer Gesamtbetrachtung im Sinne einer tateinheitlichen Begehung, wie sie das deutsche Strafrecht vorsieht, erfolgt nicht.

(3) Darüber hinaus geht das *DOJ* strafrechtlich gegen die Beklagte vor. Insoweit    97
geht es um die Verletzung verschiedener bundesrechtlicher Straftatbestände.

(4) Angekündigt und zum Teil schon erhoben sind ferner eine Vielzahl von    98
Sammelklagen und Klagen betroffener Kunden der Beklagten in den USA und in Deutschland. Hierzu überreichen wir eine Zusammenstellung mit Presseberichten als

**- Anlagenkonvolut K 40 -.**

(5) Am 29. März 2016 erhob die *Federal Trade Commission* (*FTC*) der    99
Vereinigten Staaten Zivilklage gegen die *VWGoA*. Eine Kopie der Klageschrift überreichen wir als

- Anlage K 41 -.

Der *VWGoA* wird vorgeworfen, sie habe durch ihre Werbekampagne unter dem Stichwort „*Clean Diesel*" irreführend für ihre mit illegaler Manipulationssoftware ausgestatteten Pkw geworben. Die *VWGoA* habe die Verbraucher dadurch in betrügerischer Weise über den Umfang der Emissionen, die Umweltfreundlichkeit, die Einhaltung emissionsrechtlicher Standards und einen hohen Wiederverkaufswert ihrer Diesel-Pkw getäuscht.

Die FTC beantragt unter anderem die Rückabwicklung der Kaufverträge über   100
die betroffenen Diesel-Pkw. Im Erfolgsfall müsste die Beklagte sämtliche in den USA betroffenen Pkw zurückkaufen.

2.   **Signifikanter Kursverfall der Volkswagen-Stammaktie und der Volkswagen-Vorzugsaktie**

Wie sich aus den nachfolgenden Charts (für den Handelsplatz Xetra der Frankfurter   101
Wertpapierbörse) ergibt, war in der Folge des Bekanntwerdens der Dieselmanipulationen ein erheblicher Kursrückgang sowohl der Stammaktie als auch der Vorzugsaktie der Beklagten zu verzeichnen. Als Vergleichswert ist der Deutsche Aktienindex DAX in orange eingezeichnet.



Kursverlauf der Volkswagen-Stammaktie (Quelle: faz.net)





Kursverlauf der Volkswagen-Vorzugsaktie (Quelle: faz.net)

<div style="text-align:center">

**C.**
**Rechtliche Würdigung**

**I.**
**Zulässigkeit der Klage**

</div>

Die Klage ist zulässig.

1.  Das Landgericht Braunschweig ist für die Klage gem. § 32 b Abs. 1 S. 1 Nr. 1 ZPO als    102
    sachlich zuständiges Gericht (§ 71 Abs. 2 Nr. 3 GVG) am Sitz des Emittenten auch örtlich
    zuständig.

2.  Einige der Kläger machen als *Trustees* Ansprüche für bestimmte Sondervermögen (*Trusts*)    103
    geltend. Wir werden nachfolgend in der gebotenen Kürze die Besonderheiten ihrer
    prozessualen Stellung erläutern.

    a)  In ihrer Eigenschaft als *Trustee* machen diese Kläger Vermögensschäden der von    104
        ihnen verwalteten Trusts geltend. Der *Trustee* ist dabei selbst Inhaber der ihm im
        Zuge der Trustgründung zur Verwaltung zugewiesenen Vermögenswerte
        *(OLG Celle, Urteil v. 27.10.2010 - 3 U 84/10, juris Rn. 32 ff.; vgl. auch
        Wilske/Meyer, ZIP 2012, 459, 461 m. w. N.)*. Der Trust selbst hingegen ist
        regelmäßig nicht rechtsfähig (zu Ausnahmen von diesem Grundsatz sogleich), das
        Trustgut stellt Sondervermögen dar *(OLG Celle aaO; Wilske/Meyer, ZIP 2012, 459,
        460 m. w. N.)*.

        (1)  Der Trustee führt daher Rechtsstreitigkeiten über das Trustgut in der Regel    105
             aus eigenem Recht und im eigenen Namen. Es handelt sich nicht um den Fall
             einer Prozessstandschaft. Allein der Trustee ist für die Geltendmachung der
             das Trustgut betreffenden Ansprüche aktivlegitimiert. Sofern ein Kläger als
             Trustee im vorgenannten Sinne handelt, also treuhänderisch für die
             Begünstigten des Trusts, ist dies im Aktivrubrum kenntlich gemacht.

        (2)  Es gibt jedoch auch Kläger, die im eigenen Namen und aus eigenem Recht    106
             klagen, obgleich sie nach ihrem Heimatrecht in der Rechtsform eines *Trusts*
             existieren. Ein *Trust* ist im anglo-amerikanischen Rechtskreis kein
             feststehender Rechtsbegriff. So kann sich aus dem für bestimmte Trusts
             maßgeblichen Gründungsstatut ergeben, dass es sich um einen klagebefugten

Rechtsträger handelt. Für die betroffenen Kläger haben wir dies im Anlagenkonvolut K 1 jeweils erläutert.

## II.
## Begründetheit der Klage

Die Beklagte ist den Klägern dem Grunde nach zum Schadensersatz verpflichtet. Schadensersatzansprüche der Kläger ergeben sich sowohl aus § 37b Abs. 1 Nr. 1 WpHG (hierzu sogleich unter **1**) als auch aus § 826 BGB (unter **2**). Unter **3** folgen Ausführungen zur Höhe des den Klägern jeweils entstandenen Schadens. 107

## 1.     Haftung wegen unterlassener Ad-hoc-Mitteilung (§ 37b Abs. 1 Nr. 1 WpHG)

Die Beklagte hat mehrfach gegen ihre Ad-hoc-Publizitätspflicht verstoßen. Sämtliche Kläger, die bei Bekanntwerden der Dieselmanipulationen am 18. September 2015 Aktien der Beklagten gehalten haben, haben daher dem Grunde nach einen Anspruch auf Schadensersatz aus § 37b Abs. 1 Nr. 1 WpHG gegen die Beklagte. Dabei gab es im Zeitraum zwischen 2008 und 2015 eine Vielzahl von Insiderinformationen, die die Beklagte vorsätzlich oder zumindest grob fahrlässig nicht veröffentlicht hat. Wir werden nachfolgend unter a) bis d) zunächst die Insiderinformationen und die Verpflichtung der Beklagten zu ihrer Veröffentlichung darlegen. In diesem Zusammenhang werden wir jeweils auch vorsorglich zum Verschulden der Beklagten vortragen, wobei die Beklagte insoweit beweisbelastet ist und die Voraussetzungen für eine Exkulpation nach § 37b Abs. 2 WpHG darzulegen und zu beweisen hat. Unter e) folgen dann Ausführungen zur Aktivlegitimation. 108

## a)     Insiderinformation I: Betroffenheit des US-amerikanischen Modelljahres 2009 von den Manipulationen

Diesel-Pkw des US-amerikanischen Modelljahres 2009 der Beklagten waren so manipuliert, dass ihr Schadstoffausstoß tatsächlich um ein Vielfaches höher lag, als nach offiziellen Angaben (im Folgenden auch *Insiderinformation I*). 109

Wir werden im Folgenden zeigen, dass diese Tatsache eine Insiderinformation im Sinne des § 13 Abs. 1 Satz 1 WpHG darstellt und die Beklagte dadurch, dass sie es unterlassen hat, die Insiderinformation spätestens am 30. September 2008 in Form einer Ad-hoc-Mitteilung bekannt zu machen, ihre aus § 15 Abs. 1 Satz 1 Hs. 1 WpHG folgende Ad-hoc-Publizitätspflicht verletzt hat. 110

**(1)**      **Die Beklagte unmittelbar betreffende Insiderinformation**

(a)      Konkrete Information

(i)      Der Umstand, dass Diesel-Pkw des US-amerikanischen Modelljahres 2009 der Beklagten manipuliert und ihr Schadstoffausstoß tatsächlich um ein Vielfaches höher lag, als nach offiziellen Angaben, stellt eine konkrete Information im Sinne des § 13 Abs. 1 Satz 1 WpHG und damit eine mögliche Insiderinformation dar.     111

(ii)      Eine Information ist hinreichend konkret, wenn sie so bestimmt ist, dass sie die Grundlage für eine Einschätzung über den zukünftigen Verlauf des Börsen- oder Marktpreises eines Insiderpapiers bilden kann (so die Definition im *BaFin Emittentenleitfaden 2013, Ziffer III. 2.1.1, S. 32*). Kursbewegungen müssen sich also gerade der jeweiligen Information zuordnen lassen (*Kumpan, in: Baumbach/Hopt, HGB, 36. Aufl. 2014, § 13 Rn. 1*).     112

(iii)      Die *Insiderinformation I* ist nach diesen Maßstäben hinreichend konkret. Sie bezieht sich auf einen abgrenzbaren Sachverhalt und ist spezifisch genug, um einen Schluss auf die Auswirkung gerade dieses Umstands auf den Aktienkurs der Beklagten zu erlauben (*vgl. dazu BGH, Beschluss v. 23. April 2013 – II ZB 7/09, WM 2013, 1171*).     113

(b)      Nicht öffentlich bekannt

Die beschriebene *Insiderinformation I* war bis zum 18. September 2015 eine nicht öffentlich bekannte Information. Denn erst durch die Mitteilung der *EPA* vom 18. September 2015 (*Notice of Violation I;* Anlage K 5) wurde der Öffentlichkeit bekannt, dass die Beklagte eine Manipulationssoftware in der Motorsteuerung der von ihr hergestellten und seit 2008 auf den Markt gebrachten Diesel-Fahrzeuge verwendete.     114

06788-00001/21141329.68       57       Klage vom 20. Juni 2016
CalSTRS u.a. ./. Volkswagen AG
LG Braunschweig, Az. neu

(c)   Emittentenbezug

Der für die Insiderinformation im Sinne des § 13 Abs. 1   115
Satz 1 WpHG erforderliche Emittentenbezug der *Insiderinformation I*
liegt vor. Die Manipulationen und das Inverkehrbringen entsprechend
manipulierter, *eigener* Fahrzeuge durch die Beklagte beziehen sich
unmittelbar auf die Beklagte.

(d)   Eignung zur erheblichen Kursbeeinflussung

(i)    Die *Insiderinformation I* war zum maßgeblichen Zeitpunkt am   116
30. September 2008 geeignet, im Falle ihres öffentlichen
Bekanntwerdens den Börsen- oder Marktpreis der Wertpapiere
der Beklagten erheblich zu beeinflussen.

(ii)   Eine solche Eignung ist nach § 13 Abs. 1 Satz 2 WpHG   117
gegeben, wenn ein verständiger – mit den Marktgegebenheiten
vertrauter, börsenkundiger (*BGH, Urteil v. 13. Dezember 2011
– XI ZR 51/10, WM 2012, 304, 308*) – Anleger die Information
bei seiner Anlageentscheidung berücksichtigen würde. Es ist
somit danach zu fragen, ob die Insiderinformation aus Sicht
des verständigen Anlegers aufgrund der Würdigung des
konkreten Einzelfalls und der Marktverhältnisse anhand
objektiver Maßstäbe für sich alleine mit Wahrscheinlichkeit
ein erhebliches Potential zur Kursbeeinflussung hat,
unabhängig davon, ob dieser Effekt tatsächlich eintritt
(*Royé/Fischer zu Cramburg, in: Heidel, Aktienrecht und
Kapitalmarktrecht, 4. Aufl. 2014, WpHG § 13, Rn. 4 m. w. N.*).

(iii)  Der Tatsache, dass die Beklagte eine Manipulationssoftware in   118
den von ihr hergestellten Diesel-Fahrzeugen verwendete, kam
danach zum maßgeblichen Zeitpunkt (30. September 2008)
erhebliche Kursrelevanz für die Wertpapiere der Beklagten zu.
Denn ein verständiger Anleger hätte nach Kenntniserlangung
von der beschriebenen Tatsache erkannt, dass bedeutende

Rechtsverstöße vorliegen, denen nicht nur ein geringes, sondern ein erhebliches, außergewöhnlich hohes Kursbeeinflussungspotential zukommt.

(iv)    Schwerwiegende Verstöße gegen gesetzliche Bestimmungen sind – *bereits abstrakt* betrachtet – ein Musterbeispiel für einen auf den Börsenpreis der Wertpapiere des betroffenen Emittenten durchschlagenden, kursrelevanten Vorgang (*entsprechend werden auch im Emittentenleitfaden 2013 der BaFin auf S. 53 „maßgebliche Produkthaftungs- oder Umweltschadensfälle" als Vorgänge aufgeführt, die regelmäßig Kursrelevanz besitzen*). Die für gewöhnlich mit solchen Rechtsverstößen einhergehenden finanziellen Folgen (dazu sogleich näher, c)(1)(b), **Rn. 145**) wirken sich in erheblichem Maße auf die finanzielle und wirtschaftliche Lage des Emittenten aus. Wie wir im Zusammenhang mit den Ermittlungen der US-Behörden zur *Insiderinformation VIII* noch vortragen werden (unten, c), **Rn. 136**) , gibt es zahlreiche Beispiele aus den 90er Jahren, in denen Automobilhersteller aufgrund von Maßnahmen der US-Umweltbehörden erhebliche finanziellen Aufwendungen tätigen mussten. Mit Bekanntwerden eines entsprechenden Vorgangs wird in der Konsequenz auch der Kurs der von dem betroffenen Emittenten ausgegebenen Wertpapiere negativ beeinflusst.    119

(v)    Ein mit den Marktgegebenheiten vertrauter, börsenkundiger Anleger hätte die am 30. September 2008 erfolgte Mitteilung eines (wissentlichen) Gesetzesverstoßes im Zusammenhang mit den Diesel-Pkw (Modelljahr 2009) der Marke Volkswagen der Beklagten bei seiner Anlageentscheidung berücksichtigt.    120

(vi)    Schließlich hat auch die erhebliche Veränderung des Aktienkurses nach Bekanntwerden der Insiderinformation indizielle Bedeutung für die Kursrelevanz im Zeitpunkt des    121

06788-00001/21141329.68    59    Klage vom 20. Juni 2016
CalSTRS u.a. ./. Volkswagen AG
LG Braunschweig, Az. neu

Unterlassens. Eine solche indizielle Bedeutung ist jedenfalls dann anzunehmen, wenn andere Umstände als das öffentliche Bekanntwerden der Insiderinformation für die erhebliche Kursreaktion praktisch ausgeschlossen werden können (*BGH, Urteil v. 13. Dezember 2011 – XI ZR 51/10, WM 2012, 304, 308*). Die Kurse der Volkswagen-Stammaktie und der Volkswagen-Vorzugsaktie sind als Folge des Bekanntwerdens der Dieselmanipulationen erheblich gesunken. Ein (geringer) Teil des Kursrückganges ist auf die Verwirklichung des allgemeinen Marktrisikos zurückzuführen. Das Ausmaß dieses nicht vom Schutzzweck der Kapitalmarktinformationshaftung umfassten Kursrückganges werden wir im Teil zur Schadenshöhe gesondert darlegen (hierzu unten, 3.d), **Rn. 226 ff.**). Im Übrigen jedoch ist der Kursverfall allein der Aufdeckung des Abgasskandals zuzuordnen.

> **Beweis:**       Sachverständigengutachten

## (2)    Unterlassung    der    unverzüglichen    Veröffentlichung    trotz Handlungspflicht

Die Beklagte hat es unterlassen, die beschriebene, sie unmittelbar betreffende *Insiderinformation I* zu veröffentlichen. Die *Insiderinformation I* war von der Beklagten spätestens am 30. September 2008 in Form einer Ad-hoc-Mitteilung zu veröffentlichen (§ 15 Abs. 1 Satz 1 WpHG). Eine solche Ad-hoc-Mitteilung ist nicht erfolgt.    122

## (3)    Verschulden der Beklagten

(a)    Die Haftung der Beklagten setzt nach § 37b Abs. 2 WpHG Verschulden (*Vorsatz* oder *grobe Fahrlässigkeit*) voraus, wobei hier eine Beweislastumkehr zugunsten der Kläger besteht. Im Kontext der Emittentenhaftung wegen unterlassener Kapitalmarktinformation (§ 37b WpHG) muss sich die subjektive Pflichtwidrigkeit nach Abs. 2 auf sämtliche tatbestandlichen Voraussetzungen beziehen, die die    123

Rechtspflicht nach den §§ 15 Abs. 1 Satz 1, 37b Abs. 1 WpHG begründen (*Zimmer/Grotheer, in: Schwark/Zimmer, Kapitalmarktrechts-Kommentar, 4. Aufl. 2010, WpHG § 37c Rn. 51*). Auf den eingetretenen Schaden muss sich das Verschulden bei § 37b Abs. 2 WpHG hingegen nicht beziehen (*T. Möllers/Leisch, in: Kölner Kommentar zum WpHG, 2. Aufl. 2014, §§ 37b, c Rn. 172*).

(b)   Die Beklagte handelte vorsätzlich. Sie hatte sowohl Kenntnis von der *Insiderinformation I*, als auch von der hieran anknüpfenden Ad-hoc-Publizitätspflicht. Wir werden das vorsätzliche Handeln der Beklagten im Zusammenhang mit ihrer deliktischen Haftung unten noch im Einzelnen darlegen (unten 2.a)(2)(b), **Rn. 187**).     124

(c)   Selbst bei (unterstellt) fehlendem Vorsatz war das Unterlassen der unverzüglichen Veröffentlichung der *Insiderinformation I* jedenfalls grob fahrlässig.     125

(d)   Grobe Fahrlässigkeit beschreibt im Allgemeinen einen besonders schweren Verstoß gegen die objektiv erforderliche Sorgfalt (*Grundmann, in: MüKo-BGB, 7. Aufl. 2016, Bd. 2, § 276 Rn. 94 m. w. N.*). Insbesondere bei der Beurteilung des Handelns der Organwalter, Angestellten und sonstigen Repräsentanten der Träger großer Unternehmen ist aus Verkehrsschutzerwägungen insoweit in erster Linie ein *objektiver Sorgfaltsmaßstab* anzulegen. Großen Unternehmen ist es zumutbar, Fehlverhalten ihrer Organwalter, Angestellten und sonstigen Repräsentanten durch entsprechende Organisation zu vermeiden (*Grundmann, a.a.O., § 276 Rn. 95; T. Möllers/Leisch, in: Kölner Kommentar zum WpHG, 2. Aufl. 2014, §§ 37b, 37c Rn. 166 m. w. N.*).     126

(e)   Im Kontext der Haftung wegen unterlassener Ad-hoc-Publizität ist grobe Fahrlässigkeit dann anzunehmen, wenn der Emittent sich der Kenntnis der die Insiderinformation begründenden Tatsachen einerseits sowie der Umstände, die die hieran anknüpfende Pflicht zur Veröffentlichung begründen (also der Rechtspflicht zur Ad-hoc-     127

06788-00001/21141329.68        61        Klage vom 20. Juni 2016
CalSTRS u.a. ./. Volkswagen AG
LG Braunschweig, Az. neu

Publizität) andererseits, unentschuldbar verschließt (*vgl. dazu T. Möllers/Leisch, in: Kölner Kommentar zum WpHG, 2. Aufl. 2014, §§ 37b, 37c Rn. 173 ff.*). Ein Emittent handelt (mit Blick auf die Kursrelevanz) dann grob fahrlässig, wenn er sich der Erkenntnis der üblichen Börsenreaktion verschließt (*Zimmer/Grotheer, in: Schwark/Zimmer, Kapitalmarktrechts-Kommentar, 4. Aufl. 2010, WpHG § 37c Rn. 56*).

(f)  Hinsichtlich des erstgenannten Elements (*Unkenntnis der die Insiderinformation begründenden Tatsachen*), ist der Beklagten mindestens grob fahrlässige Unkenntnis (zur tatsächlich vorliegenden Kenntnis unten 2.a)(2)(b), **Rn. 187**) vorzuwerfen.                    128

(g)  Die Organmitglieder einer juristischen Person (deren Verschulden der beklagten Gesellschaft gemäß § 31 BGB zugerechnet wird, vgl. sogleich (l), **Rn. 134**) müssen eine Organisation sicherstellen, die einen Informationsfluss innerhalb der Gesellschaft zu den jeweiligen Organmitgliedern gewährleistet (*Pflicht zur Einrichtung einer Compliance-Organisation, vgl. Sethe, in: Assmann/Schneider, WpHG Kommentar, 6. Aufl. 2012, §§ 37b, 37c Rn. 102; Zimmer/Grotheer, in: Schwark/Zimmer, Kapitalmarktrechts-Kommentar, 4. Aufl. 2010, WpHG § 37c Rn. 54 m. w. N.; ausführlich dazu auch T. Möllers/Leisch, in: Kölner Kommentar zum WpHG, 2. Aufl. 2014, §§ 37b, 37c Rn. 178 ff.*). Innerhalb einer solchen Organisation wird nach der Rechtsprechung dem Emittenten wiederum das innerhalb seiner Organisation vorhandene Wissen (gemäß § 31 bzw. § 166 Abs. 1 BGB, dazu unten 2.a)(3), **Rn. 197**) zugerechnet (*vgl. insb. BGH, Urteil v. 2. Februar 1996 – V ZR 239/94, BGHZ 132, 30; Sethe, in: Assmann/Schneider, WpHG Kommentar, 6. Aufl. 2012, §§ 37b, 37c Rn. 102 m. w. N.*). Die Beklagte kann den Einwand fehlenden Verschuldens also nicht auf die Behauptung stützen, die Vorstandsmitglieder hätten keine Kenntnis von den die *Insiderinformation I* begründenden Umständen gehabt. Denn wie bereits dargelegt, genügt für das Entstehen der Mitteilungspflicht                    129

bereits das Vorhandensein der Information an irgendeiner Stelle im Unternehmen, wenn die Weitergabe an die mitteilungspflichtige Stelle an einer unzureichenden internen Informationsorganisation scheitert (vgl. *Buck-Heeb, CCZ 2009, 18 (22)*).

(h)   Bereits die Verletzung der Pflicht zur Errichtung, angemessenen Ausstattung und Überwachung einer kapitalmarktbezogenen Compliance-Organisation begründet den Vorwurf grob fahrlässiger Unkenntnis der im Unternehmen vorhandenen Insiderinformationen (*Sethe, in: Assmann/Schneider, WpHG Kommentar, 6. Aufl. 2012, §§ 37b, 37c Rn. 102; T. Möllers/Leisch, in: Kölner Kommentar zum WpHG, 2. Aufl. 2014, §§ 37b, 37c Rn. 178*).   130

(i)   Die Beklagte kann sich insoweit nicht exkulpieren. Hätte die Beklagte ihre kapitalmarktbezogenen Compliance-Organisationspflichten erfüllt, so wären die maßgeblichen Informationen mit Sicherheit an den Vorstand weitergeleitet worden. Das liegt auf der Hand.   131

(j)   Im Gegenteil deutet alles darauf hin, dass die internen und konzernweiten Berichtswege sowie die Compliance-Systeme (und insoweit auch die zur Gewährleistung der Kapitalmarktcompliance getroffenen Vorkehrungen) weit hinter den Minimalanforderungen zurückbleiben. Das zeigt das bereits erwähnte Ermittlungsverfahren der Staatsanwaltschaft bei dem Landgericht Braunschweig gegen einen hochrangigen Justiziar der Beklagten wegen des Anfangsverdachts der versuchten Strafvereitelung und Urkundenunterdrückung (vgl. Anlage K 35). Die prozessuale Tat ist hiernach im August 2015 erfolgt, also noch vor der Bekanntmachung der Dieselmanipulationen durch die US-Behörden und vor der Veröffentlichung einer Ad-hoc-Mitteilung durch die Beklagte.   132

(k)   Selbst im Falle der Unkenntnis von der Ad-hoc-Publizitätspflicht läge zumindest grobe Fahrlässigkeit vor. Denn auch aus *ex ante* Sicht liegt die Kursrelevanz der *Insiderinformation I* auf der Hand (s. bereits unter (1)(d), **Rn. 116**). Sollte die Beklagte behaupten, dies (aus was   133

für Gründen auch immer) dennoch nicht erkannt zu haben, würde dies jedenfalls bedeuten, dass sie sich den üblichen Börsenreaktionen gegenüber verschlossen und damit *jedenfalls grob fahrlässig* gehandelt hat (*dazu Zimmer/Grotheer, in: Schwark/Zimmer, Kapitalmarktrechts-Kommentar, 4. Aufl. 2010, § 37c Rn. 56*).

(l)   Das dargelegte Verschulden der Vorstandsmitglieder bzw. diesen für    134
die Zwecke des Insiderrechts gleichzustellenden Personen unterhalb der Vorstandsebene der Beklagten, namentlich der soeben dargelegte (*jedenfalls* anzunehmende) Fahrlässigkeitsvorwurf, wird der Beklagten ohne Weiteres nach § 31 BGB zugerechnet (*Sethe, in: Assmann/Schneider, WpHG Kommentar, 6. Aufl. 2012, §§ 37b, 37c Rn. 10; T. Möllers/Leisch, in: Kölner Kommentar zum WpHG, 2. Aufl. 2014, §§ 37b, 37c Rn. 171*).

## b)   Insiderinformation II-VII: Betroffenheit der US-amerikanischen Modelljahre 2010-2015 von den Manipulationen

Die Ausstattung von Dieselfahrzeugen der Modelljahre 2010-2015 mit einer    135
rechtswidrigen Abschalteinrichtung war nach den für die *Insiderinformation I* aufgezeigten Maßstäben ebenfalls ad-hoc-pflichtig und begründet daher die Haftung der Beklagten nach § 37b WpHG dem Grunde nach. Die Ausführungen unter a) (**Rn. 109**) gelten entsprechend und werden in Bezug genommen, um Wiederholungen zu vermeiden.

## c)   Insiderinformation VIII: Auf den Untersuchungen des *ICCT* basierende Vorwürfe durch *CARB* und *EPA* im Mai 2014

Die Beklagte haftet den Klägern darüber hinaus dem Grunde nach gemäß § 37b    136
Abs. 1 Nr. 1 WpHG wegen des Unterlassens der Veröffentlichung einer weiteren Insiderinformation.

Hierbei handelt es sich um den im Sachverhalt (dazu oben B.II.1.a), **Rn. 15**)    137
beschriebenen Umstand, dass das *CARB* und die *EPA* die Beklagte sowie die *VWGoA* im Mai 2014 unter Verweis auf die Studie des *ICCT* mit dem konkreten und begründeten Vorwurf der Manipulation von Abgaswerten ihrer US-Diesel-Pkw

konfrontiert hatten (*Insiderinformation VIII*). Diese Tatsache wurde – wie dargelegt – vom *CEO* der *VWGoA* erheblich später gegenüber dem US-Kongress und der Öffentlichkeit eingestanden (dazu oben B.II.1.b), **Rn. 17**).

Die Beklagte hat durch das Unterlassen der Veröffentlichung dieser Tatsache spätestens am 31. Mai 2014 gegen ihre Ad-hoc-Mitteilungspflicht aus § 15 Abs. 1 Satz 1 Hs. 1 WpHG verstoßen und haftet den Klägern deshalb gemäß § 37b Abs. 1 Nr. 1 WpHG dem Grunde nach für den dadurch entstandenen Schaden. 138

**(1)    Die Beklagte unmittelbar betreffende Insiderinformation**

Die *Insiderinformation VIII* ist eine Insiderinformation im Sinne des § 13 Abs. 1 Satz 1 WpHG. 139

(a)    Konkrete, der Öffentlichkeit nicht bekannte Information mit Emittentenbezug

(i)    Die Tatsache, dass US-Umweltbehörden auf die Beklagte und deren US-Tochtergesellschaft VWGoA zugegangen sind und diesen gegenüber den durch die Untersuchungsergebnisse des *ICCT* gestützten Vorwurf manipulierter Abgasmesswerte erhoben haben, stellt eine konkrete, die Beklagte betreffende Tatsache dar, die zum maßgeblichen Zeitpunkt des Unterlassens der Beklagten (31. Mai 2014) nicht öffentlich bekannt war. 140

(ii)    In diesem Zusammenhang wird sich die Beklagte voraussichtlich mit dem Argument verteidigen, es handele sich um ein Zwischenereignis eines gestreckten Geschehensablaufs. Dies ergibt sich aus dem gerichtsbekannten, am 31. Mai 2016 im Bundesanzeiger veröffentlichten Musterverfahrensantrag der Beklagten, in dem der erste Feststellungsantrag lautet (*Hervorhebungen diesseits*): 141

*Es wird festgestellt, dass die im Frühjahr 2014 in den USA vorgenommenen Abgasuntersuchungen der US-Umweltbehörden CARB und EPA, die hierbei festgestellten Unregelmäßigkeiten sowie die anschließenden Gespräche zwischen der Beklagten und den US-Umweltbehörden über die technischen Ursachen der festgestellten Unregelmäßigkeiten und über etwaige Lösungen **Bestandteile eines komplexen und gestreckten Sachverhalts darstellen, die sich erst am 18. Sept. 2015** mit dem öffentlichen Bekanntwerden der unzulässigen Beeinflussung von Schadstoffmessungen bei Diesel-Fahrzeugen der VW-Gruppe **aufgrund der an diesem Tag veröffentlichten Notice of Violation** sowie der diesbezüglichen Pressekonferenz der EPA an demselben Tag zu einer kursrelevanten Insiderinformation i.S.d. §§ 13, 15 WpHG **verdichtet hatten**, die jedoch infolge der Veröffentlichung durch die EPA bereits öffentlich bekannt und daher nicht publizitätspflichtig war. (Hervorhebung diesseits)*

(iii)   Das überzeugt nicht. Bereits im Ausgangspunkt ist es intuitiv  142
unrichtig, vorsätzlich-rechtswidriges Verhalten (Täuschung über die Verwendung von Abschalteinrichtungen) und dessen Entdeckung durch Behörden oder private Dritte als einen gestreckten Sachverhalt zu begreifen. Unter einem gestreckten Sachverhalt versteht man einen zeitlich gestreckten Vorgang, bei dem über mehrere Zwischenschritte ein bestimmter Umstand verwirklicht oder ein bestimmtes Ereignis herbeigeführt werden soll (*BGH, (Vorlage-) Beschluss v. 22. November 2010 – II ZB 7/09, WM 2011, 14; zur Terminologie vgl. auch Klöhn, in: Kölner Kommentar zum WpHG, 2. Aufl. 2014, § 13 Rn. 64, vgl. ferner Erwägungsgrund 16 der Marktmissbrauchsverordnung, VO (EU) Nr. 596/2014*). Die Entdeckung rechtswidrigen Verhaltens und die daran in der Folge konkret geknüpften Rechtsfolgen sind aber nicht Elemente eines gestreckten Gesamttatbestandes. Publizitätspflichtig ist vielmehr bereits das rechtswidrige Ausgangsverhalten. Denn die negativen Folgen dieses Verhaltens und das hieraus folgende

Informationsinteresse des Kapitalmarktes stehen bereits mit Abschluss der Handlung fest. Die Beklagte versucht sachlich, die über viele Jahre „erfolgreiche" Verdeckung ihrer Manipulationen contra legem zu einer Ausnahme von der Publizitätspflicht zu machen.

(iv)   Bei den bislang diskutierten mehrstufigen      143
Entscheidungsprozessen ist die Frage, ob es sich um eine konkrete Information im Sinne des § 13 Abs. 1 Satz 1 WpHG handelt, bei jeder einzelnen (Zwischen-)Stufe zu prüfen (*BaFin Emittentenleitfaden 2013, Ziffer III. 2. 1.1.1, S. 33; siehe auch Klöhn, in: Kölner Kommentar zum WpHG, 2. Aufl. 2014, § 13 Rn. 64*). Derartigen mehrstufigen bzw. zeitlich gestreckten Vorgängen ist immanent, dass sie typischerweise bis zur endgültigen Entscheidung noch scheitern können (*BaFin Emittentenleitfaden 2013, Ziffer III. 2. 1.1.1, S. 33*). Damit ist eine über Jahre gelungene Verdeckung rechtswidrigen Verhaltens nicht vergleichbar. Die Entdeckung und die Festsetzung entsprechender Sanktionen ist vielmehr notwendige Folge des rechtswidrigen Ausgangsverhaltens.

(v)   Die Tatsache, dass die Diesel-Pkw der Beklagten von den      144
beschriebenen Manipulationen betroffen waren, ist zudem ein in sich geschlossener Sachverhalt, von dem die Klägerin Kenntnis hatte (siehe zur Kenntnis unten, 2.a)(2), **Rn. 185 ff.**). Dass US-Ermittlungsbehörden die Beklagte mit diesem konkreten Vorwurf konfrontiert haben, ist ebenfalls keine Tatsache, die erst in Verbindung mit weiteren Ereignissen zu dem maßgeblichen, veröffentlichungspflichtigen Letztereignis führt. Denn die Beklagte wusste bereits im Mai 2014, dass der Vorwurf der EPA zutraf. Das ist bei eigenem, vorsätzlich-rechtswidrigen Verhalten des Emittenten typischerweise der Fall. Wenn sich die Beklagte in diesem Zusammenhang darauf

berufen möchte, Gespräche mit den Umweltbehörden hätten noch zu einer Abwendung von Sanktionen führen können, muss sie gleichzeitig vortragen, dass sie vorhatte, die Manipulationen weiterhin zu verschleiern und in einem US-behördlichen Ermittlungsverfahren nicht zu kooperieren. Dies wäre dann wiederum ein ad-hoc-pflichtiges Ereignis, zu dem ebenfalls keine Veröffentlichung erfolgte. Somit ist bereits die *Insiderinformation VIII* für sich genommen eine konkrete Insiderinformation im Sinne des § 13 Abs. 1 Satz 1 WpHG. Es wäre auch für das Insiderrecht dysfunktional, wenn der Emittent den Zeitpunkt der Veröffentlichung durch eine Fortsetzung rechtswidrigen Verhaltens mitbestimmen könnte.

(b)    Eignung zur erheblichen Kursbeeinflussung

Die Kursrelevanz der *Insiderinformation VIII* ergibt sich nach dem Maßstab der *ex-ante* Betrachtung aus Sicht des verständigen Anlegers (§ 13 Abs. 1 Satz 2 WpHG) insbesondere aus den konkreten und begründeten Vorwürfen der US-Behörden *EPA* und *CARB*, die mit umfassenden Ermittlungs- und Sanktionsbefugnissen ausgestattet sind. Derartige Vorwürfe sind wegen der drohenden Folgen für den Emittenten stets von hoher Kursrelevanz. Dies gilt auch (und erst recht) bei Würdigung der Umstände des hier zu beurteilenden, konkreten Falls.    145

Für die Bestimmung der Kursrelevanz ist dabei auf die Eintrittswahrscheinlichkeit der zukünftigen unsicheren finanziellen Folgen der *Insiderinformation VIII* abzustellen (*vgl. Klöhn, in: Kölner Kommentar zum WpHG, 2. Aufl. 2014, § 13 Rn. 190*). Dabei stellt die *Insiderinformation VIII* eine sichere Information über die Vorwürfe durch *CARB* und *EPA* dar, die den damals noch nicht eingetretenen aber vorhersehbaren Umstand erheblicher finanzieller Folgen einschließt.    146

<u>Im Einzelnen</u>

(i) Die auf die Untersuchungen des *ICCT* Bezug nehmenden und 147
im Mai 2014 erhoben Vorwürfe der *EPA* gegenüber der
Beklagten ließen – wenn auch noch nicht abschließend
bezifferbare, so doch jedenfalls erhebliche (und damit
kursrelevante) – finanzielle Belastungen der Beklagten mit
hoher Wahrscheinlichkeit erwarten.

(ii) Dies gilt bereits mit Blick auf die von der *EPA* für 148
entsprechende Fälle regelmäßig verhängten **Bußgelder**. Diese
allein bewegen sich in vergleichbaren Konstellationen häufig
bereits im kursrelevanten Bereich.

**Beweis:** Sachverständigengutachten

(iii) Hinzu kommen aber Kosten für in entsprechenden Fällen von 149
der *EPA* regelmäßig aufgegebene Test- und
Umbauverpflichtungen, Zahlungen für Umweltschutzprogram-
me usw., die die Bußgelder noch einmal um ein Vielfaches
übersteigen können.

**Beweis:** Sachverständigengutachten

Die nachfolgenden <u>Beispiele</u> belegen dies anschaulich:

(A) Das Beispiel <u>Caterpillar</u>

Die EPA hat im Jahr 1998 in einem Vergleich sieben 150
Hersteller von Diesel-LKW (unter anderem
Caterpillar) zur Zahlung von insgesamt rund einer
Milliarde Dollar verpflichtet. Auch hier ging es um den
Vorwurf des Einsatzes einer Manipulationssoftware,
die die Einhaltung von Stickoxid-Grenzwerten unter
Testbedingungen sicherstellte, während die Grenzwerte
im normalen Fahrbetrieb überschritten wurden. Im

06788-00001/21141329.68       69       Klage vom 20. Juni 2016
CalSTRS u.a. ./. Volkswagen AG
LG Braunschweig, Az. neu

Vergleichswege wurde eine Einigung erzielt, nach der die betroffenen Unternehmen Zahlungsverpflichtungen von insgesamt etwa **USD 1 Milliarde** eingegangen sind. (Inflationsbereinigt entspricht das im Jahr 2016 einem Betrag von ca. USD 1,5 Milliarden.) Neben Bußgeldern in Höhe von USD 83,4 Millionen waren hierfür Auflagen zur Produktion sauberer Motoren (USD 850 Millionen) und Zahlungen an Umweltschutzprogramme in Höhe von USD 109,5 Millionen verantwortlich.

Als

151

**- Anlage K 42 -**

überreichen wir die entsprechende Pressemitteilung der *EPA* vom 22. Oktober 1998.

(B)   Das Beispiel Honda

Ähnlich verhielt es sich im Jahr 1998 bei einer Vereinbarung zwischen der *EPA* und dem Fahrzeughersteller *Honda* im Zusammenhang mit 1,6 Millionen zu beanstandenden Fahrzeugen, bei der sich Gesamtkosten für *Honda* für Verstöße gegen den *Clean Air Act* auf **USD 267 Millionen** beliefen; vgl. die als

152

**- Anlage K 43 -**

überreichte Pressemitteilung der *EPA* vom 8. Juni 1998.

Unter Berücksichtigung von Geldbußen und kostenintensiven Auflagen aus Vergleichen mit US-Umweltbehörden war im vorliegenden Fall aus der über § 13 Abs. 1 WpHG auch für die Beklagten maßgeblichen Sicht eines verständigen Anlegers bei

153

Bekanntwerden der oben beschriebenen Vorwürfe mit Zahlungsverpflichtungen zu rechnen, die sich mindestens im mittleren dreistelligen Millionenbereich bewegten.

**Beweis:**     Sachverständigengutachten

(iv)  Indes greift hier eine bloße Betrachtung von im Rahmen von Vergleichen gezahlten Summen für die Beurteilung der Kursrelevanz einer Insidertatsache deutlich zu kurz. Zusätzlich zu den behördlichen Bußgeldern und den beschriebenen Vergleichsnebenkosten sind auch die folgenden, aus *ex ante* Sicht kursrelevanten Gesichtspunkte von Bedeutung, die wir im Folgenden (erneut beispielhaft) kurz skizzieren:     154

(A)   Klagen bzw. Sammelklagen von Pkw-Käufern

Finanzielle Risiken in Gestalt von Verbraucherklagen und Verlusten von Marktanteilen infolge Reputationsverlusts drohten insbesondere auch deswegen, weil zum maßgeblichen Zeitpunkt mit einer Veröffentlichung festzustellender Verstöße durch die *EPA* jederzeit zu rechnen war. Denn die *EPA* macht ihre Untersuchungen und Verfahrenshandlungen ganz regelmäßig öffentlich.     155

**Beweis:**     Sachverständigengutachten

In ihrem Memorandum vom 21. November 1985 (dort S. 4, Ziffer III. A. 4.), vorgelegt als     156

**- Anlage K 44 -,**

wird bezüglich der Publizität von Vollzugstätigkeiten deren Veröffentlichung als Schlüsselelement festgelegt. Insbesondere sollen keine Vereinbarungen, die das Unterlassen einer Pressemitteilung vorsehen, getroffen werden. Dies ist seither auch gängige Praxis,

weshalb die Beklagte keinen Grund zur Annahme hatte, die streitgegenständliche Diesel-Thematik hätte mit den genannten US-Umweltbehörden ohne Einbeziehung der Öffentlichkeit geregelt werden können.

**Beweis:**  Sachverständigengutachten

(B)  Strafzahlungen wegen irreführender Werbung

Weitere finanzielle Risiken ergeben sich auch aus drohenden Strafzahlungen wegen irreführender Werbung. Dies belegt die nunmehr eingereichte Klage der *Federal Trade Commission* (*FTC*): Die Beklagte hatte, wie beschrieben, seit dem Jahr 2008 im Rahmen ihrer Dieselstrategie auf dem US-amerikanischen Markt eine Werbekampagne unter dem Slogan „*Clean Diesel*" geführt. Dass eine solche Werbung vor dem Hintergrund der streitgegenständlichen Manipulationen von Abgaswerten von Aufsichtsbehörden als irreführend klassifiziert werden würde, lag und liegt auf der Hand. Das Risiko einer Klage durch die *FTC* bei Bekanntwerden der Manipulationen wäre real und konkret gewesen; die Einleitung des Klageverfahrens wegen irreführender Werbung gegen die Beklagte am 29. März 2016 bestätigt dies. Ein verständiger Anleger im Sinne des § 13 Abs. 1 S. 2 WpHG hätte dies bei seiner Anlageentscheidung ebenfalls berücksichtigt.

(C)  Reputationsverlust und daraus folgender Verlust von Marktanteilen.

Ein – wie hier durch die *Insiderinformation VIII* – konkret drohender Reputationsverlust und der daraus resultierende Marktanteilsverlust sind von erheblicher

157

158

Kursrelevanz. Die aufgezeigte Strategie der Beklagten baute werbewirksam auf dem Label „*Clean Diesel*" auf. Das Bekanntwerden der *Insiderinformation VIII* hätte diese Strategie in erheblichem Maße beschädigt. Bereits in den Börsenkurs eingepreiste zukünftige Umsätze und Gewinne auf dem US-Dieselmarkt wären mit Bekanntgabe der *Insiderinformation VIII* hinfällig geworden. Dies hätte verständige Anleger vom Kauf der VW-Aktien ganz Abstand nehmen lassen. Jedenfalls wäre der Börsenkurs ganz erheblich negativ beeinflusst worden.

> **Beweis:**      Sachverständigengutachten

(v)    Ebenfalls kursrelevant sind weitere Folgen, wie etwa die    159
Haftung für Steuergutschriften, die aufgrund von besonders niedrigen Emissionen gewährt wurden und die Kosten der Beseitigung des Gesetzesverstoßes durch Rückruf oder Rückkauf der betroffenen Pkw. Einem verständigen Anleger ist darüber hinaus klar, dass ein weltweit tätiger industrieller Automobilhersteller aus Effizienzgründen regelmäßig identische Bauteile (hier Dieselaggregate) in vielen weiteren (als den im Mai 2014 beanstandeten) Modellen auf verschiedenen weiteren Absatzmärkten nutzt. Daher war es bereits im Falle der Veröffentlichung der *Insiderinformation VIII* aus Anlegersicht naheliegend, dass sich die Rechtsverstöße nicht nur auf den US-Markt beschränken würden, was das finanzielle Risiko noch einmal erhöht.

(vi)   Wie die Gesamtbetrachtung zeigt, übersteigen die Folgekosten    160
der Rechtsverstöße die Kosten der unmittelbaren verwaltungsbehördlichen Sanktionen u. U. um ein Vielfaches. Es handelt sich hier um einen regelhaften Geschehensablauf, der für die Beklagte offenkundig gewesen sein muss. Die

Kenntnis der die *Insiderinformation VIII* begründenden Umstände hätte die Anlageentscheidungen eines verständigen Anlegers im Sinne des § 13 Abs. 1 S. 2 WpHG deswegen maßgeblich beeinflusst.

(vii) Die Beklagte hat die *Insiderinformation VIII* entgegen ihrer Pflicht aus § 15 Abs. 1 Hs. 1 WpHG nicht unverzüglich veröffentlicht.   161

## (2) Verschulden

Die Beklagte hat vorsätzlich gegen ihre aus § 15 Abs. 1 Satz 1 Hs. 1 WpHG folgende Pflicht zur unverzüglichen Veröffentlichung der *Insiderinformation VIII* verstoßen. Wir werden dies unten im Rahmen der anspruchsbegründenden Voraussetzungen für die deliktische Haftung der Beklagten im Einzelnen darlegen (2.c)(2), **Rn. 209 ff.**).   162

Dessen ungeachtet beruhte die Unterlassung der Veröffentlichung aber zumindest auf grober Fahrlässigkeit. Den rechtlichen Maßstab für grobe Fahrlässigkeit im Zusammenhang mit § 37 b Abs. 2 WpHG haben wir oben bereits aufgezeigt (a)(3)(e), **Rn. 127**). Ein Exkulpationsversuch der Beklagten kann wegen der nachweislich ihr und der *VWGoA* gegenüber erhobenen Vorwürfe der *EPA* und des *CARB* nur noch auf die Behauptung gestützt werden, der Beklagten sei die Kursrelevanz der *Insiderinformation VIII* zum maßgeblichen Zeitpunkt (31. Mai 2014) nicht bewusst gewesen. Ein solcher Einwand wäre nicht glaubhaft. Er ist angesichts der von der Beklagten abgegebenen Stellungnahmen gleichwohl zu erwarten, so dass wir im Folgenden kurz darlegen werden, dass eine derartige Unkenntnis – sollte sie tatsächlich bestanden haben – jedenfalls auf grober Fahrlässigkeit beruhte.   163

(a) Die Beklagte hat gegenüber der Öffentlichkeit erklärt, dass sich eine Kursrelevanz aus ihrer Sicht erst am 18. September 2015 ergeben habe, als die Verletzung US-amerikanischer Umweltschutzrichtlinien bekannt gemacht wurde. Bis dahin sei von einer – vermeintlich – überschaubaren Anzahl an betroffenen Fahrzeugen (etwa 500.000)   164

und Bußgeldern in einem zweistelligen oder unteren dreistelligen Millionen-Bereich auszugehen gewesen. Daher sei man davon ausgegangen, eine kursneutrale Lösung der Diesel-Thematik erreichen zu können (siehe Pressemitteilung der Beklagten vom 2. März 2016, Anlage K 8).

(b)   Darüber hinaus behauptet die Beklagte in Erwiderung auf bereits anhängige Anlegerklagen offenbar, dass ihr Vorstand nach dem Bekanntwerden der Vorwürfe des *CARB* und der *EPA* angenommen habe, die Angelegenheit ohne Einbeziehung der Öffentlichkeit einvernehmlich lösen zu können. Es muss daher davon ausgegangen werden, dass die Beklagte die Kursrelevanz der *Insiderinformation VIII* auch mit dem Verweis auf aus *ex-ante* Sicht unvorhersehbare Öffentlichkeitsreaktionen in Abrede stellen wird.   165

(c)   Das überzeugt nicht. Mit Blick auf die beschriebenen Veröffentlichungsgrundsätze der *EPA* (s.o., (1)(b)(iv)(A), **Rn. 155**) war bereits im Mai 2014 mit einer Veröffentlichung der Untersuchungen und der Vorwürfe durch die *EPA* zu rechnen. Eine gegenteilige Hoffnung wäre aufgrund der strikten und auch bereits seit Jahrzehnten praktizierten *Policy* der *EPA* fernliegend und damit jedenfalls grob fahrlässig.   166

(d)   Auch die vermeintliche Annahme, die behördlichen Ermittlungsverfahren gegen die Zahlung einer geringen Geldbuße erledigen zu können entbehrt einer belastbaren Grundlage. Basierend auf den oben aufgezeigten, bisher von großen Fahzeugherstellern mit der *EPA* abgeschlossenen Vergleichen durfte nicht mit einer nur geringen Strafzahlung gerechnet werden, die zudem nur einen Teil der gesamten finanziellen Auswirkungen ausmacht. Insgesamt musste die Beklagte damit rechnen, auch im Rahmen eines Vergleichs eine erhebliche, die Grenzen der Kursrelevanz weit überschreitende Geldsumme zahlen zu müssen. Die Vielzahl der aufgezeigten und jedenfalls in ihrer Gesamtheit kursrelevanten Konsequenzen bei   167

Bekanntwerden der *Insiderinformation VIII* mussten sich der Beklagten schon zum hier maßgeblichen Zeitpunkt (31. Mai 2014) aufdrängen.

(e)   Die Beklagte hat die Kursrelevanz der *Insiderinformation VIII* nach   168 alledem zumindest grob fahrlässig verkannt (§ 37b Abs. 2 WpHG).

d)   **Insiderinformation IX: Eingeständnis der Manipulationen gegenüber *CARB* und *EPA* am 3. September 2015**

Schließlich haftet die Beklagte den Klägern gemäß § 37b Abs. 1 Nr. 1 WpHG wegen   169 des Unterlassens der unverzüglichen Bekanntgabe ihres vorbehaltlosen Eingeständnisses der Abgasmanipulationen gegenüber dem *CARB* und der *EPA* am 3. September 2015 (*Insiderinformation IX*, siehe hierzu auch oben unter B.II.1.c), **Rn. 22 ff.**) in Form einer Ad-hoc-Mitteilung.

(1)   **Die Beklagte unmittelbar betreffende Insiderinformation**

Die *Insiderinformation IX* ist eine weitere konkrete, die Beklagte unmittelbar   170 betreffende Tatsache mit erheblicher Kursrelevanz, die die Beklagte unverzüglich hätte veröffentlichen müssen (§ 15 Abs. 1 Hs. 1 WpHG, § 13 Abs. 1 Satz 1 WpHG).

Das finale Eingeständnis der zuvor erhobenen Vorwürfe beeinflusst die   171 Erwartungen verständiger Anleger erheblich. Der Beklagten drohten drastische finanzielle Konsequenzen, die den Marktwert ihrer Aktien erheblich beeinflussen. Anstatt die Öffentlichkeit unverzüglich zu informieren, wartete die Beklagte bis zum 22. September 2015, bis sie eine entsprechende Ad-hoc-Mitteilung veröffentlichte. Das Abwarten über einen Zeitraum von fast *drei Wochen* zwischen dem Eingeständnis der Manipulationen gegenüber den US-Behörden und der Veröffentlichung einer Ad-hoc-Mitteilung zu den Manipulationen ist keine unverzügliche Veröffentlichung im Sinne von § 15 Abs. 1 WpHG. Unverzügliches Handeln ist ein Handeln ohne schuldhaftes Zögern (§ 121 Abs. 1 Satz 1 BGB) und hätte erfordert, die *Insiderinformation IX* jedenfalls am Tag nach dem

06788-00001/21141329.68      76      Klage vom 20. Juni 2016
CalSTRS u.a. ./. Volkswagen AG
LG Braunschweig, Az. neu

Eingeständnis, also am 4. September 2015, bekannt zu machen. Es sind keine Gründe ersichtlich, die diese Verzögerung rechtfertigen können.

Rein vorsorglich ist bereits an dieser Stelle klarzustellen, dass auch die Voraussetzungen für eine Selbstbefreiung nach § 15 Abs. 3 WpHG nicht vorliegen. Hiernach ist ein Emittent von der Pflicht zur Veröffentlichung solange befreit, wie es der Schutz seiner berechtigten Interessen erfordert, wenn keine Irreführung der Öffentlichkeit zu befürchten ist und der Emittent die Vertraulichkeit der Insiderinformation gewährleisten kann. Es ist nicht nachvollziehbar, woraus sich ein etwaiges Geheimhaltungsinteresse der Beklagten ergeben sollte.

**(2)    Verschulden**

Die Beklagte handelte vorsätzlich. Sie kannte die Bedeutung der *Insiderinformation IX* und wusste, dass sie zu deren unverzüglichen Veröffentlichung verpflichtet war.

**e)    Aktivlegitimation der Kläger**

Jeder Kläger, der bei Bekanntwerden der Dieselmanipulationen am 18. September 2015 Aktien der Beklagten gehalten hat, ist zur Geltendmachung eines Anspruchs nach § 37 Abs. 1 Nr. 1 WpHG aktivlegitimiert. Lediglich bei ██████████████
██ [names of two individual claimants] ██████████████████████ ist dies nicht der Fall. Diese stützen ihren Schadensersatzanspruch daher ausschließlich auf § 826 BGB.

Wir werden hierzu in den noch folgenden Ausführungen zum Aktienerwerb der jeweiligen Kläger weiter vortragen (hierzu unter 3.d), **Rn. 226**).

**2.    Haftung wegen vorsätzlicher sittenwidriger Schädigung (§ 826 BGB)**

Die Beklagte hat die Kläger auch vorsätzlich in einer gegen die guten Sitten verstoßenden Weise geschädigt und ist diesen daher zum Ersatz des dadurch verursachten Schadens verpflichtet (§ 826 BGB). Dabei erfüllt jedes Unterlassen der Veröffentlichung der oben

172

173

174

175

176

dargestellten *Insiderinformationen I-IX* für sich genommen den Tatbestand der vorsätzlichen sittenwidrigen Schädigung.

Wir werden dies nachfolgend im Einzelnen zeigen.

**a)   Vorsätzliche sittenwidrige Schädigung durch Unterlassen der Veröffentlichung der Insiderinformation I**

Das Unterlassen der unverzüglichen Veröffentlichung der *Insiderinformation I*   177 (Manipulation der Diesel-Pkw des US-amerikanischen Modelljahres 2009 vgl. oben 1.a)) stellt eine vorsätzliche, sittenwidrige Schädigung der Kläger dar.

**(1)   Sittenwidriges Verhalten**

(a)   Maßstab

Das Merkmal der Sittenwidrigkeit ist erfüllt, wenn das maßgebliche   178 Verhalten gegen das Anstandsgefühl aller billig und gerecht Denkenden verstößt (*RGZ 48, 114, 124; RGZ 155, 257, 277; BGH, Urteil v. 09.07.1953 – IV ZR 242/52, BGHZ 10, 228, 232 = NJW 1953, 1665*). Dabei kommt es nicht auf die Anschauung der Gesamtbevölkerung, sondern auf diejenige der konkret betroffenen Verkehrskreise an (*BGH, Urteil v. 09.07.1953 – IV ZR 242/52, BGHZ 10, 228, 232 = NJW 1953, 1665*). Die besondere Verwerflichkeit des Handelns muss sich aus dem verfolgten *Ziel*, den eingesetzten *Mitteln*, der zutage getretenen *Gesinnung* oder den eingetretenen *Folgen* ergeben (*BGH, Urteil v. 19.07.2004 – II ZR 402/02, NJW 2004, 2971, 2973*). Unter Berücksichtigung dieser Umstände ist zur Feststellung der Sittenwidrigkeit eine Gesamtwürdigung vorzunehmen (*vgl. BGH, Urteil v. 13.12.2011 – XI ZR 51/10; siehe auch LG Braunschweig, Urteil v. 19.09.2012 – 5 O 1110/11*).

(b)   Sittenwidrigkeit der Unterlassung der Veröffentlichung der *Insiderinformation I*

Die Unterlassung der Veröffentlichung der *Insiderinformation I* ist    179
nach dem vorstehend beschriebenen Maßstab sittenwidrig.

(i)   Ziel der Beklagten war es, mit vergleichsweise geringem    180
Aufwand (Verwendung einer Manipulationssoftware) den
Eindruck tatsächlich nicht erreichter Eigenschaften der von ihr
verbauten Dieselmotoren zu vermitteln. Hierfür nahm sie in
Kauf, dass gesetzliche Grenzwerte für Stickoxide erheblich
überschritten wurden. Gleichzeitig rühmte sie sich damit,
besonders saubere Dieselmotoren in ihren Fahrzeugen zu
verbauen, was jedoch tatsächlich nicht der Fall war. So
erzeugte die Beklagte in der Öffentlichkeit (und insbesondere
bei ihren Aktionären, ihren Kunden und möglichen Anlegern)
systematisch eine Fehlvorstellung über die tatsächliche, in
Wirklichkeit rechtswidrige, Grundlage für einen bedeutenden
Teil ihrer Geschäftstätigkeit.

(ii)   Das der Beklagten zurechenbare Handeln beschränkte sich    181
dabei nicht allein auf ein Unterlassen des rechtlich Gebotenen.
Die Vorstandsmitglieder und die weiteren für die Beklagte
handelnden Personen haben veranlasst, jedenfalls aber
geduldet, dass die Beklagte ihre Diesel-Aggregate als
besonders sauber und umweltfreundlich bewarb („Clean
Diesel" usw.). Hierin liegt eine besonders grobe Irreführung
nicht nur der allgemeinen Öffentlichkeit sondern auch der
Sekundärmarktteilnehmer. Von Bedeutung ist in diesem
Zusammenhang auch die globale Klimapolitik, der in dem
streitgegenständlichen Zeitraum höchste politische
Aufmerksamkeit zukam und weiterhin zukommt (zu denken
ist hier beispielsweise an die United Nations Framework
Convention on Climate Change).

(iii)  Die Beklagte hat die Öffentlichkeit, die mit Blick auf die    182
verbraucher- und insbesondere auch umweltrelevante
Abgasaffäre ein enorm hohes Informationsinteresse besaß, zur
Verfolgung eigener wirtschaftlicher Interessen und zur
Aufrechterhaltung illegaler Praktiken trotz Möglichkeit zur
Aufklärung bewusst im Dunkeln gelassen.

(iv)  Dabei hat die Beklagte insbesondere auch die Interessen der    183
anderen Kapitalmarktteilnehmer zur Verfolgung ihrer
rechtswidrigen Ziele erheblich beeinträchtigt. Neben den
unterschiedlichen Folgen, die der Abgasskandal für die
Beklagte hatte und hat (siehe oben unter B.III, **Rn. 88 ff.**), sind
in diesem Zusammenhang auch die den Klägern und anderen
Anlegern entstandenen, besonders hohen Schäden zu
beachten. Diese beruhen adäquat kausal auf dem oben
beschriebenen Verhalten der Beklagten. Die für den hier
maßgeblichen, früheren Zeitpunkt des Unterlassens jedenfalls
indiziell wirkenden Kursverluste der Stamm- und
Vorzugsaktie der Beklagten (teilweise um bis zu 40 %) und
die damit korrespondierenden Anlegerverluste sind erheblich.

(v)  Unter verständiger Berücksichtigung des mit dem Unterlassen    184
der Veröffentlichung der *Insiderinformation I* verfolgten Ziels
und der sonstigen vorstehend dargelegten Umstände ergibt
sich im Rahmen einer Gesamtwürdigung, dass das der
Beklagten zurechenbare Verhalten sittenwidrig war.

**(2)    Vorsatz**

Die Beklagte handelte auch vorsätzlich. Der Vorsatz der Beklagten bezieht    185
sich dabei nicht nur auf das Unterlassen der gebotenen Information des
Kapitalmarktes sondern auch auf die weiteren, den Sittenverstoß
begründenden Umstände sowie auf die auf ihrem Verhalten beruhenden
Schäden der Kläger.

(a)   Maßstab

Für den Vorsatz im Rahmen des § 826 BGB genügt nach allgemeiner   186
Auffassung *dolus eventualis* (*Wagner, in: MüKo-BGB, Bd. 5,
6. Aufl. 2013, § 826 Rn. 26*). Danach genügt es, wenn der Täter die
Richtung, in der sich sein Verhalten zum Schaden (nicht notwendig
konkret identifizierter) Dritter auswirken könnte, die die
Sittenwidrigkeit seines Verhaltens begründenden Umstände sowie die
Art des möglicherweise eintretenden Schadens vorausgesehen und
mindestens billigend in Kauf genommen hat (ständige
Rechtsprechung, so schon *RGZ 55, 60; BGH, Urt. v. 20.11.1990 - VI
ZR 6/90, NJW 1991, 634*). Nicht erforderlich ist die Kenntnis der
Person des Geschädigten (*Wagner, in: MüKo-BGB, Bd. 5,
6. Aufl. 2013, § 826 Rn. 24*).

(b)   Vorsätzliches Handeln der Beklagten

(i)   Als innere Tatsache ist der Vorsatz dem direkten Beweis nicht   187
zugänglich; auf ihn muss daher anhand objektiver Umstände
geschlossen werden (*Wagner, in: MüKo-BGB, Bd. 5, 6. Aufl.
2013, § 826 Rn. 24; Oechsler, in: Staudinger-BGB, Buch 2,
2014, § 826 Rn. 75*). Dabei kann auch auf Erfahrungssätze
über die Motivation zu bestimmten Verhaltensweisen
abgestellt werden (*Grundmann, in: MüKo-BGB, Bd. 2,
7. Aufl. 2016, § 276 Rn. 189*). Zwar setzt Vorsatz im
Gegensatz zu Fahrlässigkeit grundsätzlich mehr als eine nur
objektiv erkennbare Gefahr voraus; drängt sich die Gefahr
jedoch geradezu auf, kann ein den Anscheinsbeweis tragender
Erfahrungssatz bestehen, dass sie auch dem Schädiger im
Zweifel bekannt war (*Oechsler, in: Staudinger-BGB, Buch 2,
2014, § 826 Rn. 96*).

(ii)   Wie in der Sachverhaltsdarstellung gezeigt (siehe oben unter   188
B.II.3.d), **Rn. 67 ff.**), musste sich sowohl dem Markenvorstand
*Hackenberg* und weiteren leitenden Mitarbeitern der

Beklagten (*Hatz*, *Hadler* und *Rudolph*) als auch insbesondere dem Konzernvorstand aufgrund der beschriebenen Umstände (*überraschende, vollständige Zielerreichung trotz gering gehaltener Entwicklungsinvestitionen, vgl. oben* B.II.3.d), **Rn. 74 ff.**) zum maßgeblichen Zeitpunkt des Unterlassens der gebotenen Ad-hoc-Mitteilung die Gefahr von Abgasmanipulationen aufdrängen.

(iii)   Es bestand daher eine *Informationsabfragepflicht* des Vorstandes hinsichtlich möglicher Insiderinformationen. Eine solche Pflicht entsteht insbesondere dann, wenn – wie hier – auf Produktionsebene Zielvorgaben erfüllt werden, die bei objektiver Betrachtung nicht oder nur sehr schwer zu den kalkulierten Kosten erfüllt werden können (*vgl. Wilken/Hagemann, BB 2016, 66, 70*). Ist eine Abfragepflicht aufgrund derartiger Umstände anzunehmen, kann sich der Vorstand nicht auf Unkenntnis der abzufragenden Informationen berufen (*Wilken/Hagemann, BB 2016, 66, 70*).   189

(iv)   Es ist daher davon auszugehen, dass die oben genannten Personen von den Manipulationen Kenntnis gehabt, diesen Umstand zumindest aber für möglich gehalten haben.   190

(v)   Da die genannten Personen nichts gegen die Manipulationen unternommen (das Inverkehrbringen der Diesel-Pkw des US-Modelljahres 2009 mit Manipulationssoftware nicht verhindert) haben, haben sie die beschriebenen Rechtsverstöße zumindest billigend in Kauf genommen und damit mit Eventualvorsatz gehandelt.   191

(vi)   Die Mitglieder des Konzernvorstandes der Beklagten waren sich auch darüber bewusst, dass zum maßgeblichen Zeitpunkt (30. September 2008) eine Ad-hoc-Mitteilungspflicht, bezogen auf den Umstand der Betroffenheit der Diesel-Fahrzeuge des US-amerikanischen Modelljahres 2009 der Beklagten von den   192

06788-00001/21141329.68       82       Klage vom 20. Juni 2016
CalSTRS u.a. ./. Volkswagen AG
LG Braunschweig, Az. neu

Abgasmanipulationen, bestand. Eine solche Kenntnis kann bei beratenen Konzernvorständen nicht glaubhaft in Abrede gestellt werden (*vgl. hierzu Zimmer/Grotheer, in: Schwark/Zimmer, Kapitalmarktrechts-Kommentar, 4. Aufl. 2010, WpHG § 37c Rn. 57 m. w. N.*).

(vii)   Zur Vermeidung der Konsequenzen einer Aufdeckung der Manipulationen wollten die Mitglieder des Konzernvorstandes die Manipulationen nicht öffentlich machen und haben deshalb die gebotene Veröffentlichung der *Insiderinformation I* bewusst unterlassen.   193

(viii)  Hinsichtlich des erforderlichen Vorsatzes bezüglich der Kausalität des eigenen Verhaltens genügt die Kenntnis der Richtung, in der sich das eigene Verhalten zum Schadenseintritt entwickeln konnte (*Wagner, in: MüKo-BGB, Bd. 5, 6. Aufl. 2013, § 826 Rn. 24*). Nicht erforderlich sind Vorstellungen zu den Einzelheiten des Kausalverlaufs. Dass die Konzernvorstände es für möglich hielten, dass ein Unterlassen der Information des Kapitalmarktes zu einem Vermögensschaden von Kapitalanlegern führt, wird die Beklagte nicht bestreiten.   194

(ix)    Die Beklagte handelte auch im Hinblick auf die die Sittenwidrigkeit ihres Verhaltens begründenden Umstände vorsätzlich. Dem Konzernvorstand war die Verwerflichkeit des bezweckten Ziels, der eingesetzten Mittel, der eigenen Gesinnung sowie der Folgen bekannt.   195

(x)     Die für eine Haftung nach § 826 BGB erforderlichen Vorsatzelemente liegen daher vor.   196

### (3)   Zurechnung des sittenwidrigen Verhaltens und der Kenntnis

Das Verhalten sowie das Wissen der für die Beklagte handelnden Personen, hier insbesondere den Mitgliedern des Konzernvorstandes der Beklagten, des   197

in den Jahren 2007 bis 2012 amtierenden Entwicklungsvorstandes der Pkw-Marke der Beklagten *Hackenberg* sowie des von 2007 bis 2011 tätigen Motorenchefs der Pkw-Marke der Beklagten *Hatz*  sind dieser nach §§ 31, 166 Abs. 1 BGB in vollem Umfang zuzurechnen. Dabei beziehen sich das zugerechnete Verhalten und das zugerechnete Wissen der beiden namentlich genannten Personen auf die Handlungen und das Wissen unmittelbar auf die Manipulationen; während sich das Verhalten sowie das Wissen im Zusammenhang mit der unterlassenen Ad-hoc Mitteilung auf den Vorstand als hierfür zuständiges Organ der Beklagten beziehen.

(a)    Verhaltenszurechnung

(i)    Die sogenannte Repräsentantenhaftung nach § 31 BGB    198
erstreckt sich sowohl auf die verfassungsmäßig berufenen Vertreter einer juristischen Person, wie etwa den Vorstand und dessen Mitglieder, als auch auf leitende Angestellte, die zwar nicht mit rechtsgeschäftlicher Vertretungsmacht ausgestattet und auch nicht in einem Aufgabenbereich innerhalb der geschäftsführenden Verwaltungstätigkeit der juristischen Person tätig sind, denen nach der internen Praxis der juristischen Person jedoch bedeutsame Funktionen zur selbständigen, eigenverantwortlichen Erfüllung zugewiesen sind (*BGH, Urteil v. 30.10.1967 – VII ZR 82/65, BGHZ 49, 19, 21 = NJW 1968, 391 f.; vgl. dazu auch Arnold, in: MüKo-BGB, 7. Aufl. 2015, § 31 Rn. 20*).

(ii)    Die Voraussetzungen der *Handlungszurechnung* nach    199
§ 31 BGB sind hier mit Blick auf die Mitglieder des Konzernvorstandes als verfassungsmäßig berufene Vertreter der Beklagten ohne Weiteres und mit Blick auf die Herren *Hackenberg, Hatz, Hadler* und *Rudolph* erfüllt, weil sowohl dem Leiter der Motorenentwicklung *Hatz* und dem Leiter der Diesel-Entwicklung *Rudolph*, als auch – erst Recht – dem Entwicklungsvorstand der Marke Volkswagen *Hackenberg*

Leitungsaufgaben nach den aufgezeigten Kriterien der höchstrichterlichen Rechtsprechung übertragen waren.

(b)   Wissenszurechnung

(i)   Eine Wissenszurechnung der Mitglieder des   200
Konzernvorstandes der Beklagten erfolgt aufgrund deren
organschaftlicher Vertretungsmacht ohne Weiteres nach
§ 31 BGB.

(ii)   Das Wissen der für die Beklagte handelnden Personen   201
(insbesondere der für die Beklagte in leitender Position
handelnden Herren *Hackenberg, Hatz, Hadler* und *Rudolph*),
ist der Beklagten entsprechend § 166 Abs. 1 BGB
zuzurechnen.

(iii)   Dies folgt aus den von der Rechtsprechung entwickelten   202
Grundsätzen zur Wissenszurechnung in arbeitsteiligen
Organisationen und der im Lichte des Verkehrsschutzes
erwachsenden Pflicht, die interne Kommunikation
ordnungsgemäß zu organisieren (*vgl. BGH, Urteil
v. 13.10.2000 – V ZR 349/99, NJW 2001, 359, 360; Schubert,
in: MüKo-BGB, 7. Aufl. 2015, § 166 Rn. 49 ff. m. w. N.*). Dabei
wird der Organisation das Wissen hinsichtlich solcher
Vorgänge zugerechnet, deren Relevanz für spätere
Geschäftsvorgänge innerhalb des jeweiligen
Organisationsbereichs für den Wissenden erkennbar ist und
die deshalb bei sachgerechter Organisation dokumentiert und
verfügbar gehalten oder an andere Personen innerhalb des
Organisationsbereichs weitergegeben werden müssen (*BGH,
Urteil v. 27.3.2001 – VI ZR 12/00, NJW 2001, 2535, 2536*).
Voraussetzung für die Wissenszurechnung ist mithin, dass das
Wissen bei ordnungsgemäßer Organisation aktenmäßig
dokumentiert, verfügbar gehalten und im konkreten Fall
genutzt werden musste.

(iv)    Bei den im Bereich der Motorenentwicklung der Beklagten entstandenen Informationen über den Einsatz von Manipulationssoftware handelt es sich um solche, die typischerweise aktenmäßig festzuhaltendes Wissen darstellen. Denn der gesamte Vorgang, von der Konzeption bis hin zur Wirkungsweise der Abgaswertverfälschung, stellt sich als zu komplexer Vorgang dar, als dass hierüber keine Notizen bzw. sonstige Schriftstücke gefertigt worden wären.    203

(v)    Diese Informationen waren mit Blick auf die oben dargestellte Organisation der Beklagten vom Entwicklungsvorstand der Marke Volkswagen (*Hackenberg*) sowie von den jeweiligen Leitern der Motorenentwicklung der Marke (*Hadler*) bzw. des Konzerns (*Hatz* und *Rudolph*) zur Kenntnis zu nehmen und an den Vorstand der Beklagten weiterzuleiten. Denn die genannten Personen hatten jeweils für den von ihnen geleiteten Bereich im Rechtsverkehr als Repräsentanten der Beklagten bestimmte Aufgaben eigenverantwortlich zu erledigen und dabei die in ihrem Organisationsbereich entstandenen Informationen weiterzugeben. Sie waren mithin als *Wissensvertreter* der Beklagten anzusehen; ihre Kenntnis ist der Beklagten nach den oben aufgezeigten Grundsätzen daher zuzurechnen (vgl. *Schubert, in: MüKo-BGB, 7. Aufl. 2015, § 166 Rn. 27*).    204

Nach alledem haben die Kläger dem Grunde nach einen Anspruch auf Schadensersatz gegen die Beklagte aus § 826 BGB wegen des Verschweigens der *Insiderinformation I*.    205

**b)**    **Vorsätzliche sittenwidrige Schädigung durch Unterlassen der Veröffentlichung der Insiderinformationen II-VII**

Die Beklagte haftet den Klägern gemäß § 826 BGB dem Grunde nach auch für den Schaden, der den Klägern dadurch entstanden ist, dass die Beklagte es (spätestens) jeweils vor Beginn des neuen Modelljahres am 30. September unterlassen hat, den    206

06788-00001/21141329.68      86      Klage vom 20. Juni 2016
CalSTRS u.a. ./. Volkswagen AG
LG Braunschweig, Az. neu

Kapitalmarkt darüber zu informieren, dass (auch) die Diesel-Fahrzeuge der US-amerikanischen Modelljahre 2010-2015 der Beklagten von den Abgasmanipulationen betroffen waren. Die Ausführungen zum Modelljahr 2009 gelten insoweit sinngemäß. Hierauf wird verwiesen, um Wiederholungen zu vermeiden.

c)   **Vorsätzliche sittenwidrige Schädigung durch Unterlassen der Veröffentlichung der Insiderinformation VIII**

Die Beklagte haftet den Klägern gemäß § 826 BGB dem Grunde nach ferner für den    207
Schaden, der den Klägern dadurch entstanden ist, dass die Beklagte es unterlassen hat, den Kapitalmarkt darüber zu informieren, dass das *CARB* und die *EPA* die Beklagte sowie die *VWGoA* im Mai 2014 unter Verweis auf die Studie des *ICCT* mit dem konkreten und begründeten Vorwurf der Manipulation von Abgaswerten ihrer US-Diesel-Pkw konfrontiert hatten (*Insiderinformation VIII*).

(1)   **Sittenwidriges Handeln**

Wegen der Sittenwidrigkeit können wir zunächst auf die obigen    208
Ausführungen verweisen (a)(1), **Rn. 178**). Trotz einer sich konkretisierenden Gefahr der Aufdeckung durch mit erheblichen Sanktionsbefugnissen ausgestatteten US-Behörden informierte die Beklagte weder den Finanzmarkt, noch sah sie von der weiteren Verwendung der Manipulationssoftware ab. Sie setzte vielmehr auf eine Strategie der Vertuschung und führte die rechtswidrigen Praktiken fort, ungeachtet der sich daraus ergebenden Risiken für die Beklagte selbst und ihre Anleger. Ein derartiges Verhalten ist sittenwidrig im Sinne von § 826 BGB.

(2)   **Vorsatz und Zurechnung**

Die Unterlassung der Beklagten erfolgte vorsätzlich. Das Wissen und    209
Handeln der beteiligten natürlichen Personen ist der Beklagten zurechenbar. Wir verweisen erneut auf unsere Ausführungen unter a)(2) (**Rn. 185**) und a)(3) (**Rn. 197**).

**d)**      **Vorsätzliche sittenwidrige Schädigung durch Unterlassen der Veröffentlichung der Insiderinformation IX**

Schließlich haftet die Beklagte den Klägern aus § 826 BGB auch für den Schaden, der den Klägern dadurch entstanden ist, dass die Beklagte es unterlassen hat, den Kapitalmarkt über die Tatsache ihres Eingeständnisses der Abgasmanipulationen gegenüber dem *CARB* und der *EPA* am 3. September 2015 (siehe oben unter B.II.1.c)) unverzüglich, also spätestens am 4. September 2015 (vgl. oben 1.d), **Rn. 169 ff.**), zu informieren.      210

Dass die Beklagte ihr Fehlverhalten gegenüber den zuständigen US-Behörden bereits am 3. September 2015 eingestanden hatte, den Kapitalmarkt (entgegen der Verpflichtung aus § 15 Abs. 1 Satz 1 Hs. 1 WpHG) jedoch erst am 22. September per Ad-hoc-Mitteilung über die begangenen Manipulationen informiert hat, erweist sich aus den unter a)(1) (**Rn. 178 ff.**) dargestellten Erwägungen ebenfalls als sittenwidrig. Nach dem bereits abgegebenen Eingeständnis der Beklagten am 3. September 2015 gab es keinen vernünftigen Grund, mit der kapitalmarktrechtlich gebotenen Veröffentlichung per Ad-hoc-Mitteilung noch knapp drei weitere Wochen zu warten. Vielmehr zeigt es, dass die Beklagte sich einer transparenten Aufklärung immer noch verschloss und die Vorfälle weiter geheim halten wollte. Das bereits erwähnte Ermittlungsverfahren der Staatsanwaltschaft Braunschweig gegen einen Mitarbeiter der Rechtsabteilung wegen versuchter Urkundenunterdrückung und Strafvereitelung passt da ins Bild. Die Beklagte setzte offenbar immer noch auf eine dauerhafte Verdeckung des Skandals und wurde erst aktiv, als ihr nach der Veröffentlichung der Vorfälle durch die EPA am 18. September 2015 keine andere Wahl mehr blieb, als selbst eine Ad-hoc-Mitteilung herauszugeben. Unter Abwägung aller Gesamtumstände ist das sittenwidrig.      211

Die Beklagte handelte auch mit dem für § 826 BGB erforderlichen Vorsatz (vgl. dazu die entsprechend geltenden Ausführungen oben unter a)(2), **Rn. 185 ff.**). Das Verhalten und die Kenntnis der für die Beklagten handelnden Personen sind der Beklagten zurechenbar (siehe dazu bereits oben unter a)(3), **Rn. 197 ff.**).      212

06788-00001/21141329.68          88          Klage vom 20. Juni 2016
CalSTRS u.a. ./. Volkswagen AG
LG Braunschweig, Az. neu

3.      **Haftung der Beklagten der Höhe nach**

Die Beklagte haftet den Klägern im Umfang des jeweils geltend gemachten Schadens      213
sowohl aus § 37b Abs. 1 Nr. 1 WpHG als auch aus § 826 BGB. Zunächst werden wir den
normativen Rahmen zusammenfassen (hierzu sogleich unter a**), Rn. 214 ff.**), wonach jeder
Geschädigte wahlweise den Vertragsabschlussschaden oder den Kursdifferenzschaden
geltend machen kann. Die Kläger haben dieses ihnen zustehende Wahlrecht in
unterschiedlicher Weise ausgeübt (hierzu unter b), **Rn. 221**). Hinsichtlich beider
Schadensersatzformen ist die haftungsausfüllende Kausalität gegeben (Teil c), **Rn. 222 ff.**).
Unter d) **(Rn. 226 ff.)** werden wir die Klagesumme, die im Ergebnis der richterlichen
Schätzung nach § 287 ZPO unterliegt, auf der Grundlage eines ökonomischen Gutachtens
erläutern.

a)      **Normativer Rahmen**

Der Geschädigte kann wahlweise Ersatz des Vertragsabschlussschadens und des      214
Kursdifferenzschadens verlangen (hierzu unter (1)). Jedes Umsatzgeschäft begründet
einen neuen Schaden und somit auch ein neues Wahlrecht: der Geschädigte kann
deshalb für einen Teil seiner Transaktionen Schadensersatz nach den Regeln des
Kursdifferenzschadens, für einen anderen Teil seiner Transaktionen Schadensersatz
nach den Regeln des Vertragsabschlussschadens geltend machen (unter (2)). Soweit
der Geschädigte Ersatz des erlittenen Kursdifferenzschadens verlangt, unterliegt die
Schadenshöhe richterlicher Schätzung (hierzu unter (3)).

(1)     **Wahlrecht des Geschädigten**

Dem nach § 37 Abs. 1 Nr. 1 WpHG wie auch dem nach § 826 BGB dem      215
Grunde nach anspruchsberechtigten Geschädigten stehen alternativ Ersatz des
Vertragsabschlussschadens und Ersatz des Kursdifferenzschadens zu. Dies
entspricht der praktisch allgemeinen Meinung in Rechtsprechung und
Literatur (*für § 826 BGB: BGH, Urteil v. 9. Mai 2005 – II ZR 287/02*
*(„EM.TV"), NJW 2005, 2450, 2451; für §§ 37b, 37c WpHG: BGH, Urteil*
*v. 13. Dezember 2011 – XI ZR 51/10 („IKB"), NJW 2012, 1800, 1805 f.;*
*s. ferner Bruchwitz, in: Just/Voß/Ritz/Becker, WpHG, §§ 37b, 37c Rn. 74;*

*T. Möllers/Leisch, in: Kölner Kommentar zum WpHG, 2. Aufl. 2014, §§ 37b, 37c Rn. 230 ff.*).

**(2)   Zulässigkeit einer gespaltenen Ausübung des Wahlrechts**

Jedem Kläger ist es überlassen, seinen (prozessualen) Anspruch zu begrenzen und seinen Antrag enger zu fassen, als er dies nach dem Umfang des materiell-rechtlichen Anspruchs, der bei Unterstellung des Klagevorbringens gegeben wäre, tun müsste (*BGH, Urteil v. 29.06.2000 – I ZR 29/98, GRUR 2000, 907 (908) „Filialleiterfehler"*). Es steht ihm frei, weitere (prozessuale) Ansprüche, die ihm nach dem vorgetragenen Sachverhalt zustehen könnten, nicht geltend zu machen.

216

Für jeden Kläger, der den Anforderungen an die Darlegung der haftungsbegründenden Kausalität im Rahmen des Vertragsabschlussschadens genügt, ist die Geltendmachung des Kursdifferenzschadens ein mitumfasstes „Minus". So wie es dem Kläger freisteht, für sämtliche Umsatzgeschäfte gegenüber dem Vertragsabschlussschaden den „bloßen" Kursdifferenzschaden geltend zu machen, steht es dem Kläger frei, für einen Teil seiner Umsatzgeschäfte den Vertragsabschlussschaden, für einen anderen Teil seiner Umsatzgeschäfte hingegen den Kursdifferenzschaden geltend zu machen.

217

Normativer Maßstab sind § 249 BGB und der schadensrechtliche Grundsatz der Totalreparation. Auf die begriffliche Abgrenzung zwischen positivem und negativem Interesse kommt es demgegenüber nicht an (*so in anderem Zusammenhang auch Lorenz, NJW 1999, 1001, 1001*). Für einen Anleger, der die konkrete Abschlusskausalität der unterlassenen Ad-hoc-Mitteilung nachweisen kann, bedeutet nur die Rückgängigmachung des Umsatzgeschäftes eine Totalreparation. Für einen Anleger, der die konkrete Abschlusskausalität nachweisen kann, bedeutet der Ersatz des Kursdifferenzschadens nicht den Ersatz des gesamten Schadens, sondern nur eines Teils. Es ist kein Grund erkennbar, bei §§ 37b, 37c WpHG eine Beschränkung auf die Ersatzfähigkeit <u>lediglich</u> des Kursdifferenzschadens bzw. eine entsprechende Beschränkung des Schutzumfangs oder auch eine

218

Beschränkung auf die <u>bloße</u> Kursdifferenz anzunehmen (*BGH, Urteil v. 13.12.2011 – XI ZR 51/10, NJW 2012, 1800, 1806*). Der BGH betont in der zitierten Entscheidung, dass nur der Vertragsabschlussschaden die „infolge allgemeiner Marktrisiken eingetretene Vermögensminderung" ersetzt.

**(3)    Richterliche Schätzung der Schadenshöhe, § 287 ZPO**

Macht der Geschädigte den Kursdifferenzschaden geltend, so gehört die        219
Frage, wie hoch die Kursdifferenz im Falle rechtzeitiger Ad-hoc-Publizität
gewesen wäre, nicht mehr zur haftungsbegründenden Kausalität
*(T. Möllers/Leisch, a.a.O.)*.

Als geeignete Hilfsgröße zur Ermittlung des hypothetischen Preises kann auf        220
die Kursveränderung unmittelbar nach Bekanntwerden der wahren Sachlage
zurückgegriffen und sodann vermittels rückwärtiger Induktion auf den
wahren Wert des Papiers am Tage des Geschäftsabschlusses näherungsweise
geschlossen werden. Auf Basis einer solchermaßen wissenschaftlich
abgesicherten Grundlage obliegt dem Richter die Schätzung der
Schadenshöhe im Sinne von § 287 ZPO (*BGH, Urteil v. 09.05.2005 – II ZR 287/02, WM 2005, 1358, 1359*).

**b)    Ausübung des Wahlrechts durch die Kläger**

Die Kläger haben das ihnen jeweils zustehende Wahlrecht zwischen        221
Kursdifferenzschaden und Vertragsabschlussschaden in unterschiedlicher Weise
ausgeübt. Die Zeiträume, für die die Kläger jeweils Ersatz des Vertragsabschluss-
bzw. Kursdifferenzschadens verlangen, ergeben sich aus den im Anlagenkonvolut
K 1 enthaltenen Informationen zu den einzelnen Handelsdaten.

**c)    Zur haftungsausfüllenden Kausalität**

Entscheidet sich der Kläger für die Geltendmachung des Kursdifferenzschadens, so        222
gilt für den haftungsbegründenden Kausalzusammenhang die *Preiskausalität*. Der
Schaden wird hier allein über den überhöhten Marktpreis des Wertpapiers vermittelt.

Dieser Kausalzusammenhang liegt hier vor, weil im Fall des Bekanntwerdens der *Insiderinformationen I - IX* sowohl der Kurs der Stamm- als auch der der Vorzugsaktie der Beklagten gefallen wäre.

**Beweis:**     Sachverständigengutachten

Für den Fall, dass der Geschädigte seinem Wahlrecht entsprechend den Ersatz des *Vertragsabschlussschadens* geltend macht, hat er nach der Rechtsprechung des Bundesgerichtshofes (*vgl. nur BGH, Urteil v. 13.12.2011 – XI ZR 51/10, WM 2012, 303, 311 („IKB")*) darzulegen, dass sein Entschluss zum Erwerb der in Rede stehenden Wertpapiere auf der Unterlassung der Veröffentlichung der Insiderinformation durch den Emittenten beruht.   223

Auch diese Voraussetzung liegt bei allen Klägern vor, die mit dieser Klage den Vertragsabschlussschaden geltend machen. Denn die Kläger hätten als verantwortungsbewusste Anleger bei pflichtgemäßer Kapitalmarktkommunikation der Beklagten und daraus folgender Kenntnis der von der Beklagten zurückgehaltenen Insiderinformationen keine Aktien der Beklagten erworben.   224

**Beweis im Bestreitensfalle:**     Zeugnis der Investmentmanager der Kläger, die die konkreten Anlageentscheidungen getroffen haben.

Dies gilt sowohl für die erste von der Beklagten am 30. September 2008 zurückgehaltene *Insiderinformation I*, als auch für die *Insiderinformationen II bis IX*, die die Beklagte in der Folgezeit pflichtwidrig und bewusst nicht veröffentlichte. Denn mit jeder der in Bezug genommenen Insiderinformationen ging ein hohes Risiko für die weitere Kursentwicklung einher, so dass die Entscheidung, in Aktien der Beklagten zu investieren zum jeweiligen Zeitpunkt unkalkulierbare Risiken für die Werthaltigkeit der betroffenen Finanzinstrumente bedeutet hätte. Diese Risiken wären die Kläger nicht eingegangen.   225

**Beweis:**     wie vor.

**d)    Darlegung der Schadenshöhe**

Nachfolgend werden wir die Schadenshöhe für die einzelnen Kläger darlegen. Dabei    226
erfolgt zunächst eine Erläuterung der zugrundeliegenden Methoden für die
Berechnung des Kursdifferenzschadens (hierzu unter (1)) und des
Vertragsabschlussschadens (hierzu unter (2)). Unter (3) haben wir für jeden der
Kläger den auf ihn entfallenden Gesamtschaden dargelegt.

**(1)    Bestimmung des Kursdifferenzschadens**

(a)    Zur Bestimmung des Kursdifferenzschadens wurde zunächst die auf    227
das Bekanntwerden der Insiderinformation zurückzuführende
Kursdifferenz pro Aktie (zum Zeitpunkt des Bekanntwerdens)
bestimmt. Diese wurde dann über den streitgegenständlichen
Handelszeitraum abgezinst. Die so ermittelten täglichen
Kursdifferenzwerte wurden dann auf Basis der sogenannten FIFO-
Methode auf die Handelsdaten der Kläger angewendet, um so den
Kursdifferenzschaden der jeweiligen Kläger zu bestimmen.

Zum Vorgang und dem Ergebnis überreichen wir als    228

**- Anlage K 45 -**

ein Gutachten von Herrn Prof. Dr. Klaus Röder (im Folgenden das
„**Sachverständigengutachten**"), Inhaber des Lehrstuhls für
Betriebswirtschaftslehre, insbesondere Finanzdienstleistungen, an der
Universität Regensburg.

(b)    Die Methode stellt als Anknüpfungsdatum auf den 22. September    229
2015 ab (hierzu sogleich unter (i)). Auf dieser Basis zeigt der um die
allgemeine Marktbewegung bereinigte Kursverlust der jeweiligen
Aktiengattung am Handelstag des 22. September 2015 relativ zum
letzten Handelstag der Desinformationsphase, also dem 18. September
2015, um welchen Euro-Betrag die jeweilige Aktiengattung zuvor
(also am 18. September 2015) überbewertet war (hierzu unter (ii)).
Die meisten Umsatzgeschäfte der Kläger wurden jedoch nicht am

letzten Handelstag der Desinformationsphase, dem 18. September 2015, getätigt, sondern zu einer Vielzahl unterschiedlicher Zeitpunkte im streitgegenständlichen Zeitraum. Aufgrund der allgemeinen Geldentwertung muss der zum 22. September 2015 festgestellte Kursabschlag über alle Handelstage des streitgegenständlichen Zeitraums abgezinst werden (hierzu sub (iii)), ehe man ihn auf die Handelsdaten der Kläger anwenden kann.

(i)     Maßgeblichkeit des 22. September 2015

Am 18. September 2015 machte die *EPA* die bestätigten Abgasmanipulationen durch die Beklagte öffentlich bekannt (s. oben, B.II.1.c), **Rn. 24**).  230

Wie die Beklagte in ihrer Pressemitteilung vom 20. September 2015 selbst hervorhebt, richtete sich die Mitteilung der *EPA* an die Öffentlichkeit in den USA, war also unabhängig von ihrem Inhalt schon nicht geeignet, die Bereichsöffentlichkeit herzustellen.  231

Die Pressemitteilung der Beklagten vom 20. September 2015 ist inhaltlich vage und allgemein formuliert. Auch deswegen war die Pressemitteilung nicht geeignet, die Bereichsöffentlichkeit herzustellen. Erst die Mitteilungen der Beklagten vom 22. September 2015 (Pressemitteilung und Ad-hoc-Mitteilung) beschäftigen sich konkret mit den Vorwürfen und dem Ausmaß der Manipulationen. Allenfalls am 22. September 2015 ist also die Bereichsöffentlichkeit über die streitgegenständlichen kursrelevanten Tatsachen hergestellt worden.  232

Der Kursdifferenzschaden der beiden Aktiengattungen ist also unter Zugrundelegung der Kursreaktionen am 21. September *und* am 22. September 2015 zu ermitteln. Hierzu sind die Kursreaktionen an beiden Tagen um die allgemeine  233

Marktentwicklung zu bereinigen (um nur denjenigen Teil der Kursrückgänge herauszufiltern, der auf dem Bekanntwerden der kursrelevanten Informationen beruht) und sodann zu kombinieren.

(ii)    Kursdifferenzschaden zum 22. September 2015

Um den Kursdifferenzschaden zum 22. September 2015 zu     234
bestimmen, werden der Kursrückgang am 21. September 2015 und der Kursrückgang am 22. September 2015 um die allgemeine Marktentwicklung bereinigt (Sachverständigengutachten, Anlage K 45, S. 5 ff.). Diese Betrachtung ergibt (für jede Aktiengattung) den prozentualen Differenzschaden pro Handelstag (hierzu unter (A)). Anschließend werden diese beiden Werte kumuliert (hierzu (B)), und der resultierende sog. Abnormale Performance Index mit dem Kurswert am 18. September 2015 multipliziert (hierzu unter (C)).

Im Einzelnen:

(A)    Der Schutzbereich der Haftung für den     235
Kursdifferenzschaden umfasst allein denjenigen Schaden, den eine pflichtgemäße Anlasspublizität der Beklagten verhindert hätte. Das allgemeine Marktrisiko gehört nicht dazu. Der geschädigte Anleger hätte das allgemeine Marktrisiko auch im Falle pflichtgemäßer Anlasspublizität der Beklagten (der rechtzeitigen Veröffentlichung der streitgegenständlichen Insiderinformation im Wege einer Ad-hoc-Mitteilung) zu tragen gehabt.

Aus den festgestellten Kursrückgängen an den     236
Handelstagen 21. und 22. September 2015 ist somit zunächst jeweils derjenige Anteil herauszurechnen, der

auf dem allgemeinen Marktrisiko beruht und nicht dem Schutzzweck der Informationsdeliktshaftung für den Kursdifferenzschaden unterfällt. Diese Berechnung ist für die Volkswagen-Stammaktien und Volkswagen-Vorzugsaktien gesondert vorzunehmen.

Der Kursrückgang ist in dem Sachverständigengutachten als *abnormale Rendite der Volkswagen Aktie zu Zeitpunkt t (abgekürzt* $A_t$*)* bezeichnet, die allgemeine Marktentwicklung ist mit *erwartete normale Rendite der Volkswagen Aktie zum Zeitpunkt t (abgekürzt* $r_t$*)* bezeichnet, und der festgestellte Kursrückgang ist mit dem Begriff *Rendite der Volkswagen Aktie zum Zeitpunkt t* belegt. 237

Die Bestimmung Kursrückganges folgt der Gleichung $A_t = r_t - r_{n,t}$. Die Berechnung der abnormalen Renditen der beiden Aktiengattungen an den Handelstagen 21. und 22. September 2015 ergibt folgende Werte (Sachverständigengutachten, Anlage K 45 S. 9 f.). 238

**Volkswagen-Stammaktie**

21. September 2015: -18,53 vom Hundert

22. September 2015: -13,63 vom Hundert

**Volkswagen-Vorzugsaktie**

21. September 2015: -19,93 vom Hundert

22. September 2015: -16,73 vom Hundert

(B) Diese so ermittelten Differenzschäden sind zu kumulieren. Der prozentuale Wert wird als *Abnormaler Performance Index* bezeichnet. Er beträgt für die Volkswagen-Stammaktie zum 22. September 2015 -29,63 % und für die Volkswagen Vorzugsaktie - 239

33,33 % jeweils gegenüber dem Wert am 18. September 2015.

(C)   Der kumulierte prozentuale Kursdifferenzschaden über   240
beide Handelstage 21. und 22. September 2015 (der
Abnormale Performance Index) ist nun mit dem
Börsenkurs der jeweiligen Aktiengattung am
18. September 2015 zu multiplizieren.

Der Differenzschaden zum 22. September 2015 pro   241
Volkswagen-Stammaktie beträgt EUR 47,81. Der
Differenzschaden zum 22. September 2015 pro
Volkswagen-Vorzugsaktie beträgt EUR 54,13
(Sachverständigengutachten, Anlage K 45, S. 11).

(iii)   Abzinsung des Kursdifferenzschadens zum 22. September
2015 über den streitgegenständlichen Zeitraum

§ 37b Abs. 1 Nr. 1 WpHG gibt die Methode der   242
Schadensbestimmung in den Grundzügen vor. Der Schaden
des Anlegers besteht in der Differenz zwischen demjenigen
Preis, den er für den Erwerb des von dem Emittenten
emittierten Wertpapieres bezahlt hat und dem hypothetischen
Preis, den der geschädigte Anleger im Falle ordnungsgemäßer
Anlasspublizität seitens des Emittenten gezahlt hätte.

Bereits ermittelt wurde der Kursdifferenzschaden zum   243
22. September 2015 als absoluter Euro-Betrag pro Stück der
jeweiligen Aktiengattung. So wie im Fall von
Unternehmensbewertungen (etwa bei Strukturmaßnahmen)
künftige, den Unternehmenswert betreffende Entwicklungen
unter Zugrundelegung bestimmter Annahmen über die
künftige Zinsentwicklung auf die Gegenwart abgezinst
werden, lässt sich der zum 22. September 2015 bestimmte
Kursdifferenzschaden der jeweiligen Aktiengattung unter

Zugrundelegung von Informationen über den risikolosen Zinssatz und weiterer statistischer bzw. ökonometrischer Daten auch auf die Vergangenheit abzinsen (Sachverständigengutachten, Anlage K 45 S. 11 ff.).

Die Ergebnisse dieser Berechnung für alle Handelstage des streitgegenständlichen Zeitraums befinden sich in Anhang 5.1 zum Sachverständigengutachten (Sachverständigengutachten, S. 17 ff.).   244

(c)   Anwendung des (abgezinsten) Kursdifferenzschadens auf die Handelsdaten der Kläger.

Der letzte Schritt der Schadensberechnung besteht in der Anwendung der für jeden Handelstag im streitgegenständlichen Zeitraum im Wege der Abzinsung ermittelten Kursdifferenzabschläge auf die Handelsdaten der Kläger.   245

Der Wortlaut des § 37b Abs. 1 Nr. 1 WpHG gibt hier eine klare Methode vor: auszugehen ist von der Anzahl der Aktien, die bei Bekanntwerden der Insiderinformation (noch) gehalten werden. In einem zweiten Schritt ist festzustellen, an welchen Tagen die dem Erwerb dieser Aktien zugrundliegenden Umsatzgeschäfte getätigt wurden. Sodann ist der Tabelle der abgezinsten Kursdifferenzschäden (s. vorstehend (1), **Rn. 227**) der taggenaue Kursdifferenzschaden für den Tag des jeweiligen Umsatzgeschäftes zu entnehmen und mit der Stückzahl der von dem Umsatzgeschäft in Bezug genommenen Aktien zu multiplizieren. Die Ergebnisse für den jeweiligen Handelstag sind dann aufzuaddieren.   246

Um die Anzahl der bei Bekanntwerden der Insiderinformation gehaltenen Aktien zu ermitteln, ist vom Anfangsbestand auszugehen. Da die meisten Kläger laufend Aktien derselben Gattung gekauft und verkauft haben, ergibt sich die zum Schlusszeitpunkt gehaltene Stückzahl aus dem Saldo der zwischenzeitlichen Umsatzgeschäfte. Da   247

es jedoch für die Zwecke der Ermittlung des Kursdifferenzschadens auf den genauen Zeitpunkt ankommt, zu dem eine zum Schlusszeitpunkt noch gehaltene Aktie erworben wurde, sind die Handelsdaten der Kläger daraufhin zu analysieren, welcher Kauf welchem Verkauf entspricht und umgekehrt.

Die Saldierung der getätigten Käufe und der dazugehörigen Verkäufe erfolgt nach dem Prinzip „first in – first out" (FIFO).   248

Bei dem FIFO-Verfahren handelt es sich um ein Bewertungsvereinfachungsverfahren im Rahmen der Sammelbewertung von Vorräten des Umlaufvermögens, § 256 S. 1 HGB. Die Methode unterstellt, dass die jeweils zuerst angeschafften Vermögensgegenstände auch zuerst verbraucht oder veräußert werden.   249

Die Anwendung dieses Verfahrens als Grundlage der Schadensberechnung in Fällen wie dem vorliegenden ist allgemein anerkannt. Dabei wird dem zeitlich ersten Kauf der erste zeitlich nachfolgende Verkauf zugerechnet und dann saldiert (*vgl. hierzu auch OLG München, Musterentscheid v. 15.12.2014 – Kap 3/10, juris Rn. 77, 777 f.*).   250

**(2)   Bestimmung des Vertragsabschlussschadens**

Durch Ersatz des *Vertragsabschlussschadens* wird der jeweilige geschädigte Anleger so gestellt, als hätte er die in Rede stehenden Finanzinstrumente des pflichtwidrig handelnden Emittenten nicht erworben, § 249 Abs. 1 BGB (*T. Möllers/Leisch a. a. O. Rn. 329*). Der Anspruch ist damit auf Ersatz des negativen Interesses gerichtet. Dem Geschädigten steht ein Anspruch auf Ersatz der jeweils getätigten Erwerbsaufwendungen gegen Übertragung der erworbenen Finanzinstrumente auf den Schädiger zu (*vgl. BGH, Urteil v. 13.12.2011 – XI ZR 51/10, WM 2012, 303, 309 („IKB"); T. Möllers/Leisch a. a. O. Rn. 330*). Soweit der geschädigte Anleger die zu einem zu hohen Preis gekauften Finanzinstrumente zwischenzeitlich veräußert hat, hat er   251

Anspruch auf Ersatz des Differenzbetrages zwischen Erwerbs- und Veräußerungspreis (*BGH, Urteil v. 19.7.2004 – II ZR 217/03, NJW 2004, 2668, 2669 („Infomatec"); BGH, Urteil v. 9.5.2005 - II ZR 287/02, NJW 2005, 2450, 2452 („EM.TV")*). Dadurch wird jeweils dem Grundsatz der Naturalrestitution entsprochen (*T. Möllers/Leisch a. a. O. Rn. 334*).

Soweit Kläger mit dieser Klage den Vertragsabschlussschaden geltend machen, geht es ausschließlich um Aktien, die zum Zeitpunkt der Klageerhebung bereits wieder veräußert waren, so dass anstelle der Rückgabe der jeweilige Verkaufspreis gegenzurechnen ist.                             252

**(3)**   **Schaden der jeweiligen Kläger**

Nachstehende Tabelle enthält den jeweils auf die Kläger entfallenden und mit dieser Klage geltend gemachten Schadensersatzanspruch. Eine detailliertere Aufstellung (Eröffnungsbilanz, Zeitpunkte und Umfang der Umsatzgeschäfte, Schlussbilanz) ist in Anlagenkonvolut K 1 enthalten. Hier findet sich für jeden der Kläger eine eigenständige Anlage, in der die der Schadensberechnung zugrunde liegenden Transaktionen und der aus ihnen berechnete Schaden aufgeführt sind. Aus den Anlagen ergibt sich auch, für welchen Zeitraum die Kläger jeweils den Kursdifferenzschaden und den Vertragsabschlussschaden geltend machen.                             253

| Kläger | Schadenssumme |
|---|---|
| 1)   California State Teachers' Retirement System | █████████████ |

[losses for each individual claimant 2 to 47 (pages 101 to 104 removed)]

## 4.   Zusammenfassung

Die Beklagte hat im Zeitraum zwischen dem 30. September 2008 und dem 4. September 2015 mehrfach vorsätzlich gegen ihre Pflicht zur unverzüglichen Ad-hoc Mitteilung bestimmter Insiderinformationen verstoßen. Sie hat kursrelevante Informationen zurückgehalten und entsprechende Ad-hoc-Mitteilungen unterlassen. Dies gilt insbesondere für den Einsatz einer Manipulationssoftware zur Verfälschung von Abgasmessungen in den Diesel-Fahrzeugen der Modelljahre 2009 bis 2015. Wegen Verletzungen ihrer Pflicht aus § 15 Abs. 1 Satz 1 Hs. 1 WpHG haftet die Beklagte den Klägern gemäß § 37b Abs. 1 Nr. 1 WpHG auf Schadensersatz. 254

Daneben erfüllt das Verhalten der Beklagten – ihr pflichtwidriges und bewusstes Unterlassen mehrerer gebotener Ad-hoc-Mitteilungen, durch das den Klägern erhebliche Schäden entstanden sind – aber auch den Tatbestand der vorsätzlichen sittenwidrigen Schädigung (§ 826 BGB). Die Beklagte hat die Kläger durch bewusstes Unterlassen der Bekanntgabe mehrerer aufgezeigter Insiderinformationen im Zeitraum von 30. September 2008 bis zum 4. September 2015 vorsätzlich in sittenwidriger Weise geschädigt und ist ihnen daher zum Ersatz des ihnen entstandenen Schadens verpflichtet (§ 826 BGB). 255

Die Höhe des Schadens unterliegt, soweit die Kläger den Kursdifferenzschaden geltend machen, richterlicher Schätzung gemäß § 287 ZPO. Als Schätzungsgrundlage dienen die in Anlagenkonvolut K 1 vorgelegten Transaktionsdaten und die vom Privatgutachter Röder ermittelten, auf die Abgasmanipulation zurückgehenden überhöhten Aktienkurse der Vorzugs- und Stammaktien der Beklagten. 256

Soweit die Kläger den Vertragsabschlussschaden geltend machen, handelt es sich um Aktien, die zum Zeitpunkt der Klageerhebung von den jeweiligen Klägern nicht mehr gehalten wurden. Insoweit machen die Kläger die Differenz zwischen dem Erwerbspreis und dem Verkaufspreis geltend. 257

### III.
### Zu den geltend gemachten Zinsen

Der jeweils geltend gemachte Zinszahlungsanspruch ergibt sich aus § 291 BGB.    258

Nach alldem ist zu entscheiden wie beantragt.    259

Zur Entrichtung des Gerichtskostenvorschusses aus einem Streitwert von EUR 30.000.000 in Höhe    260
von EUR 329.208,00 haben wir einen Verrechnungsscheck beigefügt.


(Dr. N. Herrmann)
Rechtsanwältin


<u>Anlagen</u>
K 1 bis K 45